COAL & COKE RY. CO. v. DEAL.

(Circuit Court of Appeals. Fourth Circuit. February 2, 1916.)

No. 1394.

1. COMMERCE ☞27—"INTERSTATE COMMERCE"—FEDERAL EMPLOYERS' LIABILITY ACT—TELEGRAPH LINEMEN.

One who is injured while attempting to erect a telegraph pole to support wires over which messages are to be sent in directing the operation of trains of a company engaged in interstate commerce is engaged in interstate commerce, within the meaning of the federal Employers' Liability Act (Act April 22, 1908, c. 149, 35 Stat. 65 [Comp. St. 1913, §§ 8657–8665]).

[Ed. Note.—For other cases, see Commerce, Cent. Dig. § 25; Dec. Dig. ☞27.

For other definitions, see Words and Phrases, First and Second Series, Interstate Commerce.]

2. COMMERCE ☞27—EMPLOYMENT IN "INTERSTATE COMMERCE"—FEDERAL EMPLOYERS' LIABILITY ACT.

One engaged in employment necessary to the maintenance of any instrumentality essential to the successful operation of a road by a carrier engaged in interstate commerce is employed in interstate commerce under the federal Employers' Liability Act.

[Ed. Note.—For other cases, see Commerce, Cent. Dig. § 25; Dec. Dig. ☞27.]

3. MASTER AND SERVANT ☞107(8)—INJURIES TO SERVANT—DUTY OF MASTER—SAFE PLACE TO WORK—FEDERAL EMPLOYERS' LIABILITY ACT.

The federal Employers' Liability Act, though abolishing the fellow-servant doctrine, did not change the rule as to the master's nonassignable duty to exercise reasonable care in providing the servants with reasonably safe tools and appliances with which to perform the work required of him by the master.

[Ed. Note.—For other cases, see Master and Servant, Dec. Dig. ☞107(8).]

4. APPEAL AND ERROR ☞1002—REVIEW—VERDICT—CONFLICTING EVIDENCE.

Where the evidence was conflicting as to whether the use of a "deadman" was necessary for the safety of telegraph linemen erecting poles,

---

☞For other cases see same topic & KEY-NUMBER in all Key-Numbered Digests & Indexes

and whether the injured employé requested its use, but was assured by the foreman that it was not necessary, the determination of those issues by the jury in favor of plaintiff is final.

[Ed. Note.—For other cases, see Appeal and Error, Cent. Dig. §§ 3935-3937; Dec. Dig. 1002.]

5. MASTER AND SERVANT 220(8)—INJURIES TO SERVANT—ASSUMPTION OF RISK—ASSURANCE OF SAFETY.

Where a telegraph lineman requested the foreman to furnish a "deadman" for use in erecting poles, and the foreman assured him that its use was not necessary, the lineman did not assume the risk occasioned by the failure to furnish the "deadman."

[Ed. Note.—For other cases, see Master and Servant, Cent. Dig. § 646; Dec. Dig. 220(8).]

6. MASTER AND SERVANT 213(1)—INJURIES TO SERVANT—SAFE PLACE TO WORK.

Where a servant is required to work in a dangerous and unsafe place the master is liable for any injuries sustained on account of the dangerous condition, since by his contract the servant agrees to obey the master's orders, and a refusal to do so would involve his dismissal.

[Ed. Note.—For other cases, see Master and Servant, Cent. Dig. § 559; Dec. Dig. 213(1).]

In Error to the District Court of the United States for the Northern District of West Virginia, at Parkersburg; Alston G. Dayton, Judge.

Action by David F. Deal against the Coal & Coke Railway Company to recover damages for personal injuries under the federal Employers' Liability Act. Judgment for the plaintiff (215 Fed. 285), and defendant brings error. Affirmed.

George E. Price and Buckner Clay, both of Charleston, W. Va., for plaintiff in error.

Harold W. Houston, of Charleston, W. Va., for defendant in error.

Before PRITCHARD, KNAPP, and WOODS, Circuit Judges.

PRITCHARD, Circuit Judge. The plaintiff instituted an action in the District Court of the United States for the Northern District of West Virginia under the federal Employers' Liability Act against the defendant to recover damages for alleged personal injuries. The trial in the court below resulted in a verdict in favor of plaintiff in the sum of $6,500, and the case comes here on writ of error. The plaintiff in error will be referred to as defendant, and the defendant in error as plaintiff; such being the respective positions occupied by the parties in the court below.

The defendant owns and operates a steam railroad located wholly within the state of West Virginia, running from the city of Charleston to the city of Elkins. It is conceded that at the time this cause of action arose defendant was engaged in the interstate transportation of freight and passengers within the meaning of the federal Employers' Liability Act. As a part of its equipment it owned and maintained along its track a telegraph and telephone line, over which it transmitted orders for the movement of its trains while engaged in interstate commerce. This line was out of repair at the time plaintiff was injured.

The defendant had in its employ a foreman by the name of Norval Sears whose duty it was to see that this line was kept in proper condition. Sears had been in the employ of the company for 4½ years, and was clothed with the power of hiring and discharging workmen who worked under him, or assigning them places to work, and of furnishing them with the requisite tools and appliances. The men who worked under Sears did so under his direct personal commands and orders. At the time plaintiff received his injuries, four men were working under Sears. These workmen were Hambrick, Silman, Lewis, and Deal, the plaintiff. The work in which they were engaged at that time was the taking down of defective telegraph and telephone poles and substituting new ones. The wires were merely transferred from the old to the new poles.

At the time Deal received his injuries, each of the four men working under Foreman Sears had assigned to them a given part of the work then being done. Foreman Sears stood at the butt of the poles as they were being raised and placed in position, giving orders to the men and guiding the poles into their proper places. Hambrick, Lewis, and Deal were assigned the work of raising the poles, using for that purpose long wooden poles with iron spikes in one end. Deal, owing to his superior strength, had been assigned to the position of working directly beneath the poles as they were being raised, while Hambrick and Lewis each worked on opposite sides of the poles, steadying and lifting them as they were being raised. The position of Deal was the most dangerous, as he was assigned to work directly beneath the poles. If, for any reason, a pole should fall, it would likely strike Deal. Among the tools and appliances then being used in the erection of the poles was one known as a "deadman." This is a wooden pole about six feet long, in the lower end of which is a spike to keep it from slipping when placed in position on the ground, and in the upper end is a semicircular piece of iron, with a small spike fitted in the middle, which is placed against the pole being raised. This appliance is used for the purpose of supporting the pole as it is being raised, to prevent it from falling, and to hold it while the men get a new hold with their spike poles.

One of these "deadmen" was a part of the equipment which Foreman Sears had provided for the work in hand, and is an appliance or tool commonly used in such work. It had been used by the men regularly, under his direct orders, while they had been placing and raising poles about 25 feet long. Having received orders from the company to cut the poles to 20 feet Sears had directed the men to discontinue the use of the "deadman." This happened the day before Deal was injured. There is some conflict in the testimony as to whether the "deadman" was with the other tools and appliances being used, on a hand car about 50 or 60 feet from where the pole that injured Deal was being raised.

It was shown that this pole was to be erected in an unusually dangerous place. The hole in which it was to be placed was dug on the side of a hill, about 10 feet from the edge of a 40-foot perpendicular

embankment. Foreman Sears ordered Hambrick, Silman, and Deal to raise the pole, while Lewis was sent after a tamping bar. While Hambrick, Silman, and Deal were in the act of raising the pole, it fell and struck Deal on the side of the head, fracturing his skull and knocking him over the 40-foot embankment above mentioned, resulting in injuries so serious that he did not recover consciousness for 11 days. His injuries resulted in an impairment of his general health, partial destruction of the sight of one eye, dizziness when he stoops, and a material impairment of his earning capacity.

[1] We are met at the threshold of this case with the question: Was the plaintiff, at the time he was injured, employed in interstate commerce? It is a matter of common knowledge that in order to successfully operate a railroad it is essential that a carrier should have a well-equipped telegraph or telephone line constructed and maintained near to and parallel with its tracks, so as to enable its train dispatchers to transmit train orders and thereby keep the engineers and conductors properly advised as to the relative positions of the respective trains. Under these circumstances a telephone or telegraph line is just as essential to the practical operation of the road as the track or any other particular part of the road's equipment.

Owing to the recent enactment of the statute under which this suit was brought, there has been more or less uncertainty as to the scope of the same. The roadbed and track constitute an essential element in the operation of trains, and acting upon this theory the Supreme Court of the United States, in the case of Pedersen v. Delaware, L. & W. R. Co., 229 U. S. 151, 33 Sup. Ct. 649, 57 L. Ed. 1125, Ann. Cas. 1914C, 153, in discussing this phase of the question, said:

"Tracks and bridges are as indispensable to interstate commerce by railroad as are engines and cars, and sound economic reasons unite with settled rules of law in demanding that all of these instrumentalities be kept in repair. The security, expedition, and efficiency of the commerce depends in large measure upon this being done. * * * We are of opinion that the work of keeping such instrumentalities in a proper state of repair while thus used is so closely related to such commerce as to be in practice and in legal contemplation a part of it. The contention to the contrary proceeds upon the assumption that interstate commerce by railroad can be separated into its several elements, and the nature of each determined regardless of its relation to others or to the business as a whole. But this is an erroneous assumption. The true test always is: Is the work in question a part of the interstate commerce in which the carrier is engaged?"

The Supreme Court having declared that one who is injured while carrying spikes to be used in repairing a bridge over which interstate commerce is transported is deemed to be engaged in interstate commerce within the meaning of the act, it necessarily follows that, as in this instance, where one is injured while attempting to erect a telegraph pole to be used for the purpose of supporting wires over which messages are to be sent in directing the operation of trains in order that a company engaged in interstate commerce may safely operate its trains, such person is engaged in interstate commerce within the meaning of the act.

[2] It is strenuously contended that this construction would violate the rule announced by the Supreme Court in declaring the first Em-

ployers' Liability Act unconstitutional, and lead to absurdities; in other words, that there would be no place where a line could be properly drawn. The answer to this contention is, we think, that whenever it appears that a party injured is engaged in employment that is necessary to the maintenance of any of the instrumentalities essential to the successful operation of a road by a carrier engaged in interstate commerce, such party is deemed to be engaged in interstate commerce, and in case of injury, while thus engaged, is entitled to any benefits accruing under the federal Employers' Liability Act.

However, it is' insisted (a) that defendant was not guilty of negligence, and (b) that plaintiff assumed the risk incident to his employment at the time he was injured.

[3] It is urged by counsel for defendant that by the enactment of the federal Employers' Liability Act "new and somewhat different obligations are created." While the act abolished what is known as the "fellow-servant doctrine," there is nothing contained therein which changes the rule as respects the nonassignable duty of the master to exercise reasonable care in providing the servant with reasonably safe tools and appliances with which to perform the work required of him by the master. In the case of Seaboard A. L. Ry. Co. v. Horton, 233 U. S. 492, 34 Sup. Ct. 635, 58 L. Ed. 1062, L. R. A. 1915C, 1, Ann. Cas. 1915B, 475, the Supreme Court of the United States in discussing this phase of the question, said:

"There is an implied obligation of the master, under his contract with those whom he employs, to use due care in supplying and maintaining suitable instrumentalities for the performance of the work or duty which he requires of them, and he is liable for damages occasioned by a neglect or omission to fullfill this obligation, whether it arises from his own want of care or that of his agents to whom he intrusts the duty."

Section 12 of Roberts' Injuries to Interstate Employés contains the following:

"Except that it abolishes the common-law rule of nonliability for injuries to employés within its terms due to negligence of fellow servants, the first section of the federal Employers' Liability Act which defines when a carrier is liable, adopts the common-law rule of negligence as to the two branches of liability mentioned. Under the act the company is not a guarantor of the safety of the places of work or of the machinery and appliances of the company. The extent of its duty to its employés is to see that ordinary care and prudence are exercised to the end that the place in which the work is to be performed and the tools and appliances of the work may be safe for the workmen."

Thus it will be seen that in cases like the one at bar the master is required to use due care in furnishing and maintaining proper instrumentalities for the performance of the duty which he requires of the employé.

[4] That a "deadman" is a tool or appliance in general use in the performance of this character of work is not denied, and that it is essential, as a general rule, for the protection of the employés in lifting poles is equally well established. The plaintiff, among other things testified as follows:

"Well, with a deadman, now recollect that whenever you set that under a pole it can't fall straight down on top of the deadman and hit a man. It can't

go straight. It either has to fall sideways one way or the other, or else if the end at the hole slips loose the far end may drop down and the butt go up, but it can't go over on a man because the deadman keeps it off him. If the deadman had been there it would have fallen off of me, I would not have been caught under it; it would have fallen off of me, but we didn't have any deadman, and it fell direct straight down, and I had no chance to jump then at all. If I had had any chance to get out, I would have done it."

### Witness Hambrick also testified as follows:

"Q. But for what particular purpose is the deadman made and used? A. Well, it is to support the pole, or to keep the pole, the way I understand, from falling, from falling straight down. But of course a pole will fall, if you set your deadman underneath the pole, it will fall if you don't steady it, but it will have to fall sideways. It will fall that way, or fall this way, if you don't have something to steady it, keep it from falling over sideways; but it won't fall straight down if you have your deadman underneath the pole, or if the pole gets up so far. and they don't take the hole, and overbalances, of course, if you let your pike slip out of it, it may topple over sideways, but if it don't, and the deadman is used under it the pole will simply overbalance over the top of the deadman, and the top of the pole will come down and leave the butt sticking up in the air."

### Foreman Sears, a witness for the defendant, also testified as follows:

"Q. Well, isn't the object of the deadman one of the main objects of using it to prevent a pole from falling if the pike poles turn or if they happen to slip? A. Why, sure it will keep it from falling back straight down. It won't keep it from falling sideways, though."

· While it is true that the foreman testified that the poles being placed on this occasion were of such a size as not to require the use of a "deadman," plaintiff testified that they were necessary in handling poles of this character, and the question was submitted to the jury and answered in the affirmative, which disposes of this point. Therefore it is essential to determine as to whether a "deadman" was furnished on this occasion, and if not who was to blame. The plaintiff in testifying as to this point, among other things, said:

"Q. Now, Mr. Deal, do you say that you told Mr. Sears that you ought to have the deadman there? A. Yes. Q. You told him there and then? A. Yes; I told him that looked like it might be a dangerous place, and we ought to have the deadman there for safety. But he says, 'You three men can raise that pole without any deadman.' He says, 'Throw the pole in the hole.' Q. Yes; and then you undertook to do it? A. We had to do it or go down the line. Q. Had to do it, or go down the line, you say? A. Yes; one of the two. I wasn't in shape to be fired, myself. * * * Q. Well, now, was your deadman on that hand car? A. No, sir; we had left it back behind some place. Didn't bring it with us. Q. Where had you left it? A. I don't know how far it was back, but we had left it back behind. Q. Well, how long had it been since you used it? A. I think we had used it the day before, if I ain't badly mistaken. I might be mistaken in that, but I know it wasn't long before."

### Also, witness Hambrick testified as follows:

"Q. Did you understand or hear any conversation or statement by Mr. Deal to Mr. Sears? A. Well, I heard something said, but I couldn't exactly state to the words. Q. What was it, as near as you can tell? A. Well, it was concerning the deadman; but what he said I don't recollect just at this time."

251 F.—39

Also Sears, the foreman, testified on behalf of the defendant as follows:

"Q. Mr. Sears, something has been said—Mr. Deal has testified something about his having stated that you ought to use a deadman; that it was dangerous not to use it in raising that pole. Did you hear any such remark? A. No, sir. Q. Was any such remark made to you? A. No, sir; not to me. Q. Was there a deadman available? A. Yes; we had our tools. On the evening before, I always kept my tools right with me wherever I was working, and we had the deadman with our tools."

Silman, a witness in behalf of defendant, testified that he was present and attempted to start the pole down into the hole; that he never heard the "deadman" mentioned that morning; that he did not hear the defendant say that it was dangerous; that he and the plaintiff were not together all the time that morning; that witness never asked to have the "deadman" brought there as he did not deem it necessary to use it. It is true that the testimony as to this point was conflicting, but the matter was submitted to the jury and found in favor of the plaintiff.

[5] It is well settled that where an employé requests an overseer or superintendent to furnish additional tools or appliances in order to insure his safety, and the overseer or superintendent refuses to comply with such request but assures the employé that there is no danger in the service which he is required to perform, the employé, under such circumstances, will not be deemed to have assumed the risk incident to his employment.

[6] By virtue of his contract the servant agrees to obey the orders of the master, and a refusal to do so would involve his dismissal. In referring to this point Fraser on Master and Servant, page 71, says:

"Where a servant deliberately violates his master's orders, or refuses to obey them when given, he is clearly guilty of the grossest breach of contract. His duty is to obey the master in all things for which he became bound expressly, or in which obedience is implied from the nature of the service undertaken."

It is for this reason that the courts have held that where a servant is required to work in a dangerous and unsafe place that the master is responsible for any injury that he may sustain on account of such unsafe and dangerous condition. The following cases bear directly upon this point:

The Supreme Court of Missouri in the case of Burkard v. A. Leschen & Sons Rope Co., 217 Mo. 466, 117 S. W. 35, said:

"Where a servant is apprehensive that the place in which he is required to work is dangerous and unsafe, but relies * * * upon the assurance of the foreman in charge of the work and in charge of the servant that it is safe, and the servant is injured without any negligence upon his own part, the master is liable."

Also, in the case of McKee v. Tourtellotte, 167 Mass. 69, 44 N. E. 1071, 48 L. R. A. 542, the Supreme Judicial Court of Massachusetts said:

"The mere fact that a man knows the unsafe condition of a thing does not necessarily, as a matter of law, constitute him negligent if he does that thing."

The Supreme Judicial Court of Massachusetts in the case of Lord v. Wakefield, 185 Mass. 214, 70 N. E. 123, also said:

"The plaintiff was not an experienced lineman, and he was set to work to do a particular thing in a particular place, under the supervision of a superior who knew the fact that he was not an experienced lineman. While the conversation shows that the plaintiff was apprehensive of danger if the pole was not guyed, yet we are of opinion that it was a case where the jury could find that he might well yield his judgment to that of his superior, and obey the command."

Also, the case of Postal Telegraph-Cable Company v. Frank Grantham, 187 Fed. 52, 109 C. C. A. 370, is very much in point as to some of the questions involved in this case.

The jury found as a matter of fact that the plaintiff requested the foreman, Sears, to furnish a "deadman," and that instead of doing so the foreman assured him that the use of a "deadman" was not necessary to protect him from injury. Therefore, under these circumstances, according to the rule announced, the plaintiff did not assume the risk occasioned by the failure of the company to furnish a "deadman" for his protection at the time he was injured.

A careful consideration of the assignment of errors which relate to the refusal of the court below to grant certain prayers for instructions offered by the defendant impels us to the conclusion that the same are without merit.

For the reasons stated, we are of opinion that the judgment of the lower court should be affirmed.