# CHARLESTON.

URA O. HALLEY, ADMR. v. OHIO VALLEY ELECTRIC RY. CO.

Submitted October 24, 1922.   Decided October 31, 1922.

1. MASTER AND SERVANT—*Evidence Held to Show Employment by Interstate Electric Railway.*

   Where an action against an interstate electric railway company for wrongful death under Federal Employers' Liability Act, from injuries inflicted while deceased was engaged in installing a new transformer to take the place of an old one in a sub-station, though it appears that the title to the sub-station is in a Power Company, a separate corporation that furnishes electric power to defendant railway company for the operation of its cars, and defendant denies that deceased was employed by it but claims he was employed by the Power Company, evidence showing that defendant issued to deceased, when he entered upon his work, an employee's pass-book, containing tickets or coupons entitling him to free passage over its lines, which defendant could not lawfully issue to him unless he were in its service; that the pass designated him as defendant's employee and provided that any violation of its conditions might cause his suspension or discharge, and that should he cease to be an employee of defendant his wages might be held by the company for any tickets not returned; that his wages were paid by the railway company; and that the General Manager of the Power Company was also General Manager of the Railway Company, together with other facts and circumstances in the case, warranted the jury in finding that the work of installing the transformer was being done by defendant, and that deceased while engaged in that work was in defendant's service. (p. 174).

2.  COMMERCE—*Employee of Electric Railway Held Employed in Interstate Commerce.*

   One employed in the repair or maintenance of an instrumentality which is used by an electric railway company engaged in interstate commerce and which is essential to the successful operation of the railway, is employed in such commerce, under Federal Employes' Liability Act.   (p. 179).

3.  SAME—*Workman Installing Electrical Transformer to Carry Electric Current to Railway's Trolley Wires, Held Employed in Interstate Commerce.*

   A workman was injured while installing a new rotary converter and transformer in an electric sub-station, and connecting it with wires to the main or conductor bus that carries the electric current to an electric railway's trolley wires; the new transformer was to take the place of an old one which regulated the current used in the operation of the railway company's cars in interstate commerce, and was an instrumentality essential to the successful operation of the railway.  Held, that the work was one of repair and maintenance, and that the workman so engaged was employed in interstate commerce within the meaning of the Federal Act.   (p. 179).

4.  DEATH—*Six Thousand Dollars for Death of Electrical Helper Twenty Years Old, held Not Excessive.*

   Where it is shown that decedent was a vigorous young man, earning fifty  cents an hour as electrical helper, not quite twenty years of age, of good habits, industrious, kind, obedient and affectionate toward his parents, contributed occasionally small sums to their support, and had expressed a desire to assist them in purchasing them a home, a verdict of $6,000 for his wrongful death will not be set aside because excessive.   (p. 182).

Error to Circuit Court, Cabell County.

Proceeding by Ura O. Halley, administrator of the estate of Calvin O. Halley, deceased, for compensation under the federal Employers' Liability Act for the death of deceased, opposed by the Ohio Valley Electric Railway Company, employer.  From an award of compensation, the employer brings error.

*Judgment affirmed.*

*Vinson, Thompson, Meek & Renshaw,* for plaintiff in error.
*L. D. Isbell* and *R. M. Switzer,* for defendant in error.

MEREDITH, JUDGE:

Plaintiff, as administrator of the estate of his son, Calvin O. Halley, recovered a judgment of $6,000 under the Federal Employers' Liability Act, for the death of his son, occasioned by injuries received while in the alleged employ of the defendant. Calvin O. Halley, at the time of his death, was between 19 and 20 years of age and was employed as electrician's helper in the installation of certain electrical transformers in a sub-station in Huntington. While climbing or standing upon a ladder assisting in the work upon the "dead" transformer being installed, he, in some way, not made entirely clear by the evidence, came in contact with an exposed bushing on top of a "live" transformer which stood only a few inches from the ladder, and was killed.

The negligence charged was the placing by defendant or its agents of the ladder in such close proximity to the exposed bushing, the dangerous character of which was unknown to the deceased, and of which, due to his inexperience and youth, he had no means of knowing. Defendant brings error.

Three grounds of error are assigned: (1) That the evidence shows that Halley was not employed by or in the service of the defendant; (2) that at the time of his death he was not employed in interstate commerce so as to bring him within the provisions of the Federal Employers' Liability Act, and (3) that the verdict is excessive.

1. We think the jury was warranted in finding that deceased was in the employment of defendant. At the time of his death he was working at Johnson's Lane Sub-station. This station had been in operation for a number of years. It was originally owned by defendant. Defendant's general manager was permitted to state over plaintiff's objection that at the time of the accident it was owned by the Consolidated Light, Heat & Power Company, without producing written evidence of the transfer. While this statement was improper, yet it is now immaterial in view of our findings. The record shows that over the door to the sub-station were the letters: "O. V. E. Ry Co." On decedent's person was found an em-

ployee's pass, issued by defendant, which is in the following words:

"OHIO VALLEY ELECTRIC RAILWAY CO.
EMPLOYEE'S PASS.
THIS PASS ENTITLES C. O. HALLEY No.....
TO 100 CONTINUOUS RIDES ON ALL LINES.
Coupons of this Pass not good if detached.
Good only when signed by
W. R. Power,
General Manager.
No. 3545                                    12-21-19

This book consists of 8 pages and each page contains 5 tickets—of the same tickets as shown below. Sample

OHIO VALLEY ELECTRIC RAILWAY COMPANY
Employee's Pass

003545
This coupon not good if detached.
W. R. Power,
Gen'l Mgr.

CONDITIONS

1st.  This pass is void if presented by any other person than the employee in whose name it is issued. 2d.  That each coupon is good only for a ride when detached by, or in the presence of the Conductor. 3d.  Any violation of the above conditions may cause suspension or discharge, as the management may elect.  4th.  That my wages, or salary, may be held by Company for any tickets not returned when I cease to be an employee.

.....................
Employee."

A short time after his death the railway company delivered to his father two checks, issued in its name, made out in the name of the decedent, covering his wages from December 16 to December 31, 1919, and from January 1 to January 15, 1920.

There are three corporations involved, though but one is a party to this action, namely, the defendant Ohio Valley

Electric Railway Company, which operates the electric railways from Huntington, West Virginia, to Ashland, Kentucky; the Consolidated Light, Heat & Power Company, which has its main power plant at Kenova, West Virginia, and a sub-station at Johnson's Lane, in Huntington, and furnishes power to the defendant Railway Company; and the American Railways Company, with its main office in Philadelphia, Pennsylvania, which owns the majority of the stock of the other two companies. The defendant is admittedly engaged in both interstate and intrastate commerce. The record shows that Hambach, a representative of the American Railways Company, set Halley to work on this job, but he did not fix his wages, nor is it contended by defendant that Halley was employed by American Railways Company. Hambach had been sent by this company to look after this work; he testifies that the machinery was being installed for the Power Company, but does not say it was being installed by the Power Company. W. R. Powers, who was general manager of both the Power Company and the defendant, testifies that the employees doing this work were paid their wages by defendant, but he excuses defendant by stating that the Power Company did not at that time have money to pay their wages; that defendant was daily taking in money and for this reason it paid the wages of the Power Company's employees and charged the same to its account, but when asked whether or not defendant had anything whatever to do with the work being done and upon which Halley was employed, answered: "They were putting in this work for the Consolidated Light, Heat & Power Company." On further questioning he said that all that defendant did in that connection was to pay for it; however, when we consider the employees' pass issued to Halley by defendant, we find the defendant designated him as its employee; that pass provides that any violation of its conditions may cause the suspension or discharge of the employee, as the management may elect; that the employee's wages may be held by defendant for any tickets not redeemed when he should cease to be defendant's employee. It must be remembered also that it

was a clear violation of law for defendant railway company to issue an employee's pass to decedent if he was not employed by it, but was employed by the Power Company. It can not reasonably be inferred that defendant was deliberately violating the law, but on the contrary that the pass was lawfully issued to deceased as its employee, and not as the employee of the Power Company. These matters mentioned, together with other evidence were amply sufficient to warrant the jury in finding that deceased was in the service of defendant at the time of his death.

2. Having determined that decedent at the time of his injury was employed by the defendant, the next question is whether he was then employed in interstate commerce, within the meaning of the Federal Employers' Liability Act. That is the vital point in the case. Defendant is an interstate electric railway, carrying passengers and freight for hire, and is a common carrier. This is admitted. Defendant clearly comes within the act. It was then engaged in removing certain transformers with their equipment from the sub-station and replacing the same with other transformers of a different manufacture, as will more particularly hereafter appear; for all practical purposes, we may say this work was being done in defendant's sub-station. That the title to the sub-station was in the Power Company makes no difference; we have no doubt that defendant, through its agents or employees, was in charge of the work. It issued passes to those employed there as though they were its own employees, and it paid their wages. The Power Company and defendant Railway Company had the same General Manager. There was nothing said or done at any time, so far as the record discloses, that would inform any of the employees engaged there that they were working for the Power Company; on the other hand, every act indicated that they were working for the defendant, and that defendant was in charge of the sub-station.

The electric power used in propelling defendant's cars is generated at the station at Kenova. This power is used in operating defendant's cars in interstate as well as intra-

state commerce. To use it for that purpose it passes through rotary converters and transformers at the Johnston's Lane sub-station. These regulate the current used by the defendant in running its cars. The current passes out through the transformers and over a main "bus" or "conductor bus" which connects or carries it to the trolley wires. There had been in use in the sub-station for some time a number of transformers of the Westinghouse type. Some of these were to be replaced with new transformers of a different type. Defendant's exhibits Nos. 1 and 2, introduced with the evidence of Mr. Power, over plaintiff's objection, were orders or directions to Mr. Power, as General Manager of the Power Company, to install certain machinery in the sub-station, but were issued by American Railways Company. That these were directed to him as General Manager of the Power Company instead of the defendant Railway Company we do not deem important. He got no such orders from the Power Company; at least none appear. We have already shown that while decedent was helping to install this machinery he was in the service of the defendant. But the two exhibits are material evidence in the case as showing the character of the work to be done. Exhibit No. 1 says:

> "Install at Huntington sub-station two 11,000 volt oil circuit breakers with arresters and switchboard equipment and do necessary rewiring to 11,000 volt bus and equipment.
>
> Property to be replaced or withdrawn from service through the work under the estimate is to be accounted for through the store room."

Exhibit No. 2 says:

> "Install at Huntington sub-station 2-500 K. W. railway rotaries with 33000/11000 v. primary transformers and equipment, and remove present three 300 K. W. railway rotaries with transformers and equipment.
>
> Property to be replaced or withdrawn from service through the work under the estimate is to be accounted for through the store room."

·Besides other matters, each exhibit also contains these· words: "Actual or estimated original cost of property ·replaced or withdrawn from service. (With estimated salvage value of the recovery)," followed by appropriate data of the estimated cost of the salvaged material and its present value.

These orders show, as clearly as anything can show, that the work to'be done was repair work; perhaps a better term would be "maintenance work." The transformers can be treated as enlarged segments of current-carrying wire. These new ones were being installed in place of the old. So far as we can see, in its relation to interstate commerce, it was exactly the same as if the decedent had been putting in a new segment of trolley wire. While decedent was engaged in connecting up one of these new transformers to the "main bus" he was killed. The new transformer had already been put in its place. It was about four feet in diameter, cylindrical in shape, and about seven feet high. True, it had never been used; no electric current had passed through it; but so far as the record discloses, all that needed to be done was to connect it up with the main bus with short wires. That the defendant was doing when the deadly current struck him down. In our view, he was then just as much engaged in the repair or maintenance of the electric line of defendant as if he were reaching up to put in a new piece of trolley wire, and was therefore engaged in the repair of an instrumentality used in the operation of defendant's cars in interstate commerce. He was employed in interstate commerce or ·in work so closely related to it as to be practically a part of it. That is the test applied by the United States Supreme Court in *Pedersen* v. *Delaware L. & W. R. Co.*, 229 U. S. 146, 57 L. ed. 1125, 33 Sup. Ct. Rep. 648, Ann. Cas. 1914-C 153, 3 N. C. C. A. 779. We think the present case can be distinguished from the cases of *McKee* v. *Ohio Valley Elec. Co.* 78 W. Va. 131, 88 S. E. 616; *Roberts* v. *United Fuel Gas Co.*, 84 W. Va. 368, 99 S. E.· 549; and, *Shanks* v. *Delaware L. & W. R. Co.*, 239 U. S. 556, 60 L. ed. 436, L. R. A. 1916-C 797, 36 ·Sup. Ct. Rep. 188. In the McKee case the workman was killed by a fall of earth while working in an excavation under a wooden trestle on

which the railway's track crossed a small stream and near the supporting timbers thereof, intended for an abutment of a steel bridge to take the place of the trestle and to be used in lieu thereof, when completed, but he was not repairing or altering the trestle nor working on it, or on the track or anything else actually used in the operation of the railroad. In the Roberts case the plaintiff was injured while employed by defendant in digging a ditch for a pipe-line which was to be used in interstate commerce. Judge WILLIAMS in the course of his opinion says: ''The work of excavating the ditch was purely construction work, within the state, and was clearly separable and distinguishable from defendant's commercial business. The pipe line to be laid in the ditch was not part of defendant's means or appliance for carrying on either intrastate or interstate commerce, nor could it become such until the pipe was laid. This is altogether unlike a case where an employee is injured while engaged in repairing an existing means or appliance already devoted to a commercial purpose, as for instance, the work of repairing an existing railroad track, bridge or depot, which is already devoted to commerce.'' In neither of these two cases cited by counsel for defendant was the workman engaged in doing any work of repair upon an instrumentality that had been in actual use in interstate commerce. But it is otherwise in the instant case. The old transformers and the main bus had been in actual use in interstate commerce for years. The old transformers were being replaced, if the orders to Powers were being followed, and he says they were. The new transformer was being connected up to serve in lieu of the old one. Clearly, this is a work of repair. But counsel insist that the Shanks case above cited is to the contrary. Shanks was employed in a railroad machine shop and his work usually consisted in repairing certain parts of locomotives which were used in both intrastate and interstate commerce, but when injured was solely engaged in taking down and putting into a new position an overhead shaft, one of the shop fixtures, through which power was communicated to some machinery used in repair work, and the court held that the work in

which he was engaged was too remote from interstate transportation to be practically a part of it and denied liability under the statute. Shanks was not repairing any instrumentality used in interstate commerce. At most, he was only repairing a tool or appliance that was used in repairing such instrumentality. He was at least a step away from and outside the test. But in the case at bar decedent was engaged in the repair and maintenance of an instrumentality, actually used by defendant in carrying on its interstate commerce, and we think comes clearly within the test. It was not construction work in any proper sense, but repair and maintenance. This view is sustained by many authorities.

In *Ross* v. *Sheldon*, 176 Ia. 618, 154 N. W. 499, there was along the track of an interstate electric railway a line of poles, with cross-arms carrying various wires, including telegraph, block signal, power and feed wires. The signal system was operated by hand and was inadequate. The company determined to install a new system by putting on additional cross-arms, transferring the old signal wire thereto, with additional wires, and operating the system by an automatic device. While nailing one of these cross-arms to a pole, decedent came in contact with a live wire on the old cross-arms and was killed. It was held that he was engaged, not in construction work, but in the repair and maintenance of an instrumentality of interstate commerce, and defendant was liable under the Federal Act. The present case is more clearly within the statute than the Ross case. There a new automatic signal system was being installed, and when completed, was to take the place of the hand system, and it was contended there as here that while the new system was to be used in interstate commerce, it had not yet been so used. It is argued here that the new transformer had never been used. But so in the Pedersen case. The bolts which Pedersen was carrying with which to repair the bridge had never been used, but they were to be used in repairing a bridge that had been used in interstate commerce, and it was held that Pedersen was employed in such commerce.

In *Coal & Coke Ry. Co.* v. *Deal*, 231 Fed. 604 (4th C. C.

A.), a workman was injured while erecting new telegraph poles to take the place of or as substitutes for old and defective ones. The telegraph wires over which messages were sent in directing the operation of the railway company's trains engaged in interstate commerce were to be transferred to the new poles. It was held that the workman was employed in interstate commerce. In that case the pole that injured the plaintiff had never been used in such commerce, but was to be used in the repair or maintenance of an instrumentality that had been so used, to-wit, the defendant's telegraph system in connection with the operation of its trains. See also *Collins* v. *Mich. Cent. R. R. Co.*, 193 Mich. 203, 159 N. W. 535; and, *Grow* v. *Oregon Short Line Ry. Co.* 44 Utah 160, 138 Pac. 398. So the fact that defendant's transformer had never been used in interstate commerce does not affect the case. It was but a substitute for one that had been so used— was to take its place, hence as in the Deal case, decedent was, when injured, employed in interstate commerce.

In such cases it is nearly always difficult to mark out the dividing line between intra-state and interstate commerce and to tell where a given service in the one leaves off or in the other begins. There is what has been aptly termed a "twilight zone,"—a sort of no-man's land,—where the careless pleader by failing to allege liability both at common law and under the Federal Act, in separate counts, meets with many pitfalls. These troublesome questions could be avoided by careful pleading. But when such a question is presented it is the duty of this court to decide it in conformity to the decisions of the Supreme Court of the United States, the final interpreter of the statute. Our judgment is that Halley comes squarely within the spirit and letter of the rule laid down by that court in the Pedersen case, and that at the time of his injury he was employed in interstate commerce, hence within the scope of the Federal Employees' Liability Act.

3. But one question remains,—is the verdict excessive? This young man was not quite twenty years of age. He had been working away from home for three or four years, except at times when he was not employed, he worked for his father

on his farm in Ohio. When killed he was earning fifty cents an hour. He occasionally sent his parents money, though only in small sums. He had proposed to his parents that they sell their small farm, move to Huntington where he was ·employed, and that he would assist them in buying a home. He was strong and vigorous, of good habits, industrious, kind affectionate and obedient; and showed an interest in, and manifested a desire to be of financial assistance to, his parents. We doubt not that had he lived, his contribution in their behalf would have been much more than $6000; at least, we can not say the verdict is excessive.

We therefore affirm the judgment.

*Judgment affirmed.*