ELSIE ALLEN, Administratrix of the Estate of ELMER A. ALLEN, v. ST. LOUIS-SAN FRANCISCO RAILWAY COMPANY, Appellant.—53 S. W. (2d) 884.

Division One, October 22, 1932.

*E. T. Miller* and *Mann, Mann & Miller* for appellant.

*Sizer & Gardner* for respondent.

464

FERGUSON, C.—Elmer A. Allen, an employee of the defendant Railway Company, was killed while engaged, in the course of his employment, in doing certain repair work at defendant's railroad yards in Kansas City, Missouri. The widow, Elsie Allen, as administratrix brought this action, under the Federal Employers' Liability Act, to recover damages for Allen's death, alleged to have been caused by the negligence of defendant. The defendant operated a railroad business for the transportation of passengers and freight in interstate and intrastate commerce. At the conclusion of all the evidence the Railway Company moved for a directed verdict upon the ground that under the facts Allen was not, at the time he received the injury which caused his death, engaged in interstate commerce within the meaning of the Federal Employers' Liability Act. The trial court overruled the motion and the verdict and judgment, in an amount giving this court jurisdiction of the appeal, was for plaintiff. The Railway Company appealed.

It is conceded that if the facts make out a cause of action under the Federal Employers' Liability Act the evidence is sufficient to take the case to the jury on the question of defendant's negligence. Appellant contends, however, that plaintiff has no cause of action under the Federal Employers' Liability Act but redress or compensation for Allen's death must be had under the Missouri Workmen's Compensation Act. An understanding of the facts is necessary to a determination of the question. Appellant maintains extensive terminal yards in Kansas City wherein are located a roundhouse, the office building of the superintendent of terminals, a carpenter shop, boiler shop, power house, mill shop and other buildings necessary to the operation of a large railroad terminal. There were also, within the yards, numerous tracks upon which passenger coaches used in both interstate and intrastate service and Pullman cars used in interstate service were stored when trains having the terminus of their run at Kansas City arrived there. These coaches and cars were cleaned and made ready for service and then placed in passenger trains made up for runs out of Kansas City. Locomotives were kept in the roundhouse, or in these yards, between trips on the road. Repairs of varied character were made upon engines and cars while same were in these terminal yards. To take care of sewage appellant had constructed a private sewer main of vitrified tile, twenty-four inches in diameter and some twenty-four hundred feet in length, north and south, with lateral lines to the several buildings. This sewer connected at the south end of the yards with the city sewer

system. The terminal yard sewer was approximately eleven feet below the surface of the ground. It served the building used as offices for the superintendent of terminals, where a clerical force was maintained, the offices of the yard master, store room, carpenter shop, mill shop, roundhouse, restaurant and other buildings. In the power house were two large stationary boilers by means of which steam was generated and supplied, by a system of pipes, to the yards and buildings. In this manner the buildings were heated. The steam was also piped to the various tracks throughout the yards upon which coaches were stored. Trains with Kansas City as a terminus would be broken up on arrival there and the coaches placed upon these tracks. During cold weather the coaches were heated, while standing on the storage tracks, by steam piped from the power house but when a train was made up to go out of the yards the coaches were disconnected from the pipe carrying steam from the power house and were thereafter heated by steam from the locomotive. When an engine came into the terminal yards at the end of its regular run the fire was extinguished. In firing a locomotive engine preparatory to sending it out of the yards it was necessary to create a draft in addition to that produced by the smoke stack. When the fire was started and until steam in the boiler of the locomotive attained a pressure of 30 or 35 pounds, after which time the engine created its own draft, a draft was obtained by forcing steam, generated in the power house, into the front of the engine. After sufficient steam was generated in the boiler of the locomotive that steam was used to create the draft and keep the fire burning and the connection with the pipes carrying steam from the power house was then discontinued. Steam generated by means of the two boilers at the power house was not used to propel the locomotives or any other machinery. The boilers in the power house were in continuous service and were in charge of three stationary engineers, each working an eight hour shift. In order to keep the boilers free of sediment it was customary, two to three times during each eight hour shift, for the engineer to open a blow-off valve, forcing steam and scalding water out of the boilers which was carried off through a six inch pipe leading from the boiler room, underground, to and entering a manhole which was located some 75 feet from the boiler room. The six inch pipe entered the manhole about five feet below the surface of the ground. This manhole was twenty-four inches in diameter and was constructed of vitrified tile, the lower end rested on the sewer main and the top extended to about the surface of the ground. A hole had been made in the top of the sewer main, within the manhole, so that the water coming into the manhole through the pipe leading from the boilers would flow into the sewer. There was

no other pipe carrying any form of sewage into this manhole. Allen was employed by appellant as a carpenter in the bridge and building department in its Kansas City yards. On the day he was injured, the crew, of which he was a member, was engaged, under the direction of the foreman, in cleaning out the sewer main. It was found, or at least thought, that there was a partial stoppage, or the lodgment of some substance, in the sewer line about three or four feet below or south of the manhole into which the six inch pipe from the boilers entered. The foreman directed Allen to go down into the manhole by means of a ladder and enlarge the hole in the sewer main at the bottom of the manhole in order to facilitate the work of cleaning the sewer line. However before permitting Allen to enter the manhole the foreman went to the boiler room and notified the engineer in charge thereof of his intention to send a workman into the manhole and told the engineer not to open the blow-off valve on the boilers, which would cause steam and scalding water to flow from the boiler into the manhole, until notified that the work at the manhole was completed. After this notice was given Allen entered the manhole and worked there for some time. While Allen was so engaged the engineer at the boiler room opened the blow-off valves and a quantity of steam and scalding water flowed into the manhole. Allen was seriously burned and scalded resulting in his death shortly after he was removed from the manhole. There was at no time a complete stoppage of the flow in the sewer main or any serious interference therewith and there was no stoppage of any kind whatsoever, or interference in, the six inch pipe running from the boiler room to the manhole.

The Federal Employers' Liability Act declares that, ''every common carrier by railroad while engaging in commerce between any of the several states . . . shall be liable in damages to any person suffering injury while he is employed by such carrier in such commerce, or in case of the death of such employee to his or her personal representative,'' etc., if the injury results in whole or in part from the negligence of the carrier or any of its officers, agents or employees. In determining the applicability of the Act we must be governed by the interpretation thereof as made by the Supreme Court of the United States which necessitates a review of certain decisions of that court.

The test now recognized and applied was announced in Shanks v. Delaware, Lackawanna & Western Railroad Company, 239 U. S. 556. In that case Shanks an employee of the defendant Railroad Company sued for damages for personal injuries sustained in the course of his employment and alleged to have been caused by the Railroad Company's negligence. The Railroad Company was engaged in both interstate and intrastate transportation and maintained an extensive

machine shop for repairing parts of locomotives used in such transportation. Shanks was employed in this shop. Usually he did repair work on locomotives but at the time of the injury he was engaged in taking down and moving, to a new location, an overhead counter shaft through which power was communicated to some of the machinery used in the repair work. The court said: "It is essential to a right of recovery under the act not only that the carrier be engaged in interstate commerce at the time of the injury but also that the person suffering the injury be then employed by the carrier in such commerce. . . . The question for decision is, was Shanks at the time of the injury employed in interstate commerce within the meaning of the Employers' Liability Act? What his employment was on other occasions is immaterial, for, as before indicated, the act refers to the service being rendered when the injury was suffered. Having in mind the nature and usual course of the business to which the act relates and the evident purpose of Congress in adopting the act, we think it speaks of interstate commerce, not in a technical legal sense, but in a practical one better suited to the occasion (see Swift & Co. v. United States, 196 U. S. 375, 398), and that *the true test of employment in such commerce in the sense intended is, was the employee at the time of the injury engaged in interstate transportation or in work so closely related to it as to be practically a part of it.* . . . [Italics ours.]

"Coming to apply the test to the case in hand, it is plain that Shanks was not employed in interstate transportation, or in repairing or keeping in usable condition a roadbed, bridge, engine, car or other instrument then in use in such transportation. What he was doing was altering the location of a fixture in a machine shop. The connection between the fixture and interstate transportation was remote at best, for the only function of the fixture was to communicate power to machinery used in repairing parts of engines some of which were used in such transportation. This, we think, demonstrates that *the work in which Shanks was engaged,* . . . *was too remote from interstate transportation to be practically a part of it,* and therefore that he was not employed in interstate commerce within the meaning of the Employers' Liability Act."

Chicago, Burlington & Quincy Railroad Company v. Harrington, 241 U. S. 177, was decided upon the authority of the Shanks case. Harrington was employed as a switchman in the Railroad Company's terminal yard. At the time he received the injury causing his death Harrington was engaged in switching cars loaded with coal belonging to the Railroad Company, which had been standing, for some time, on a storage track. The purpose of the switching movement was to place the cars of coal at bins or chutes from which the coal could be supplied, as needed, to locomotives of all classes, some

of which "were engaged or about to be engaged in interstate . . . traffic." The question was as to the nature of Harrington's employment "at the time of the injury." The court pointed out that his duty at that time "was solely in connection with the removal of the coal from the storage tracks to the coal shed, or chutes, and the only ground for invoking the Federal Act is that the coal thus placed was to be used by locomotives in interstate hauls." In holding that Harrington was not engaged in interstate commerce within the meaning of the Act, it is said: "The Federal Act speaks of interstate commerce in a practical sense suited to the occasion and 'the true test of employment in such commerce in the sense intended is, was the employee at the time of the injury engaged in interstate transportation or in work so closely related to it as to be practically a part of it.' [Shanks v. Del., Lack. & West. Railroad, 239 U. S. 556, 558, and cases there cited.] Manifestly, there was no such close or direct relation to interstate transportation in the taking of the coal to the coal chutes. This was nothing more than the putting of the coal supply in a convenient place from which it could be taken as required for use."

The Shanks case was followed by the Supreme Court of the United States in Illinois Central Railroad Company v. Cousins, 241 U. S. 641. In that case (see Cousins v. Illinois Central Railroad Co., 126 Minn. 172) Cousins was employed by the Railroad Company in its yards and shops at Paducah, Kentucky. He was injured while "wheeling a barrow full of coal to one of the car repair shops. The coal was intended for use in heating stoves in a shop where employees of defendant were engaged in repairing cars. . . . Defendant was engaged in interstate as well as intrastate commerce, and many if not all of the cars repaired in the shop were cars that moved only in interstate commerce." Cousins sued for damages under the Federal Employers' Liability Act charging his injuries were caused by defendant's negligence. The appeal by the Railroad Company from the judgment against it, in the trial court, went to the Supreme Court of Minnesota. That court considered but one question, "was plaintiff engaged in interstate commerce at the time he was injured" and held that he was, affirming the judgment. In arriving at that conclusion the Supreme Court of Minnesota said: "That the men engaged in repairing the cars were employed in interstate commerce is well settled. That an employee, carrying materials to the shop to be used in repairing the cars, would be employed in interstate commerce, the Pedersen case (229 U. S. 146) decides. It seems no extension of the construction thus given to the statute to hold that an employee carrying coal for use in heating the shop where the repairs were made is employed in interstate commerce. The repairs could not be made unless the shop was heated." The Supreme Court of

the United States, in an opinion per curiam (241 U. S. 641), reversed the judgment "upon authority" of the Shanks case.

In Chicago & Northwestern Ry. Co. v. Bolle, 284 U. S. 77, decided by the Supreme Court of the United States, November 23, 1931, we find facts strikingly similar, in some respects, to the facts in the instant case. Bolle was employed by the Railway Company "to fire a stationary engine which was utilized to generate steam for the purpose of heating the passenger depot," and other buildings and rooms "used for general railroad purposes at Waukegan, Illinois." The steam thus generated was also used to heat "passenger coaches while standing in the yards. Some of these coaches, taken off of interstate trains moving out of Chicago were heated, when necessary, before being taken up by other interstate trains . . . and sometimes steam was used to prevent freezing of a turntable used for turning engines employed both in interstate and intrastate traffic." The "stationary engine" being temporarily out of order, Bolle was making use of a locomotive engine as a substitute. "While thus employed he was directed to accompany this locomotive engine to a place about four miles distant to obtain a supply of coal. For that purpose the engine was attached to and moved with three other locomotive engines then being prepared for use in interstate transportation. While coal was being taken upon one of the locomotives, respondent (Bolle) was seriously injured, through what is alleged to have been the negligence" of the defendant Railway Company. Action was brought in the state court of Illinois under the Federal Employers' Liability Act to recover damages for the injury. There were three trials of the case. In the first plaintiff had verdict and judgment which was reversed by the intermediate appellate court upon the ground that the evidence did not show that plaintiff was engaged in interstate commerce at the time he was injured. [235 Ill. App. 380.] The judgment of the Appellate Court was reversed by the Supreme Court of Illinois and the cause remanded (324 Ill. 479). The second trial resulted in a directed verdict and judgment for the defendant Railway Company and this judgment the appellate court, following the decision of the Supreme Court of the State, reversed. [251 Ill. App. 623.] On the third trial plaintiff again obtained a verdict and judgment. This judgment the Appellate Court affirmed (258 Ill. App. 545) and the State Supreme Court refused *certiorari*. Upon *certiorari* to the Supreme Court of the United States, that court after summarizing the facts, supra, observed, that: "The sole object of the movement of the substitute engine was to procure a supply of coal for the purpose of generating steam. Its movement was in no way related to the contemplated employment of the other three locomotives in interstate transportation; and its use differed in no way from the use of the stationary engine when that was available. There

is evidence that respondent, at other times, had been engaged in supplying other engines with coal and water, firing live engines, and turning a turntable; but his employment at the time of the injury was confined to firing the stationary or locomotive engine for. the sole purpose of producing steam. The character of the work which he did at other times, therefore, becomes immaterial. [Shanks v. Del. Lack. & West. Railroad, 239 U. S. 556, 558; Chicago, Burlington & Q. Railroad v. Harrington, 241 U. S. 177, 179.]'' The court then says: ''The appellate court, in holding upon the first appeal that respondent was not engaged in interstate commerce, applied the rule laid down in the Shanks case, supra; and in so doing was clearly right.'' The rule established by the Shanks case, ''that the true test of employment in such commerce in the sense intended is, was the employee at the time of the injury engaged in interstate transportation or in work so closely related to it as to be practically a part of it,'' is quoted and the doctrine of that case reaffirmed; the court saying:

''It will be observed that the word used in defining the test is 'transportation,' not the word 'commerce.' The two words were not regarded as interchangeable, but as conveying different meanings. Commerce covers the whole field of which transportation is only a part; and the word of narrower signification was chosen understandingly and deliberately as the appropriate term.

''The business of a railroad is not to carry on commerce generally. It is engaged in the transportation of persons and things in commerce; and hence the test of whether an employee at the time of his injury is engaged in interstate commerce, within the meaning of the act, naturally must be whether he was engaged in interstate transportation or in work so closely related to such transportation as to be practically a part of it. . . .

''The applicable test thus firmly established is not to be shaken by the one or two decisions of this court where, inadvertently, the word 'commerce' has been employed instead of the word 'transportation.'

''Plainly, the respondent in the present case does not bring himself within the rule. At the time of receiving his injury he was engaged in work not incidental to transportation in interstate commerce, but purely incidental to the furnishing of means for heating the station and other structures of the company. His duty ended when he had produced a supply of steam for that purpose. He had nothing to do with its distribution or specific use. Indeed, what he produced was not used or intended to be used, directly or indirectly, in the transportation of anything. It is plain that his work was not in interstate transportation and was not so closely related to such trans-

portation as to cause it to be practically a part of it. Certainly that work was no more closely related to transportation than was that of the employee in the Harrington case, who placed coal in the chutes for the use of locomotives engaged in interstate transportation; or that of the employee in the Cousins case, who supplied coal for heating the shop in which cars used in interstate traffic were repaired. The work of the employees in those cases and that of the respondent here are, in fact, so nearly alike in their lack of necessary relationship to interstate transportation, as to be in principle the same.''

We now refer to two cases decided by the Supreme Court of the United States subsequent to the Shanks, Harrington and Cousins cases and prior to the decision in the Bolle case, viz., Erie Railroad Company v. Collins, 253 U. S. 77, and Erie Railroad Company v. Szary, 253 U. S. 86, in which it appears that the test of the Shanks case was not followed. In the first case one duty of the employee Collins was ''to run a gasoline engine'' by means of which water was pumped into a tank for use of locomotives operating in both interstate and intrastate commerce. While so engaged he was injured and disfigured by burns resulting from an explosion of gasoline. On the theory that the work in which Collins was engaged at the time he sustained the injury ''was so closely related to it (interstate commerce) as to be practically a part of it'' (see p. 85), the court held that the Federal Employers' Liability Act applied. In the second case, Szary was engaged in drying sand on large stoves in a ''sand house.'' This sand was being so prepared for the use of locomotives of both interstate and intrastate trains. It was night time. Szary removed the ashes from the stoves, crossed a track, emptied the pail of ashes in the ash pit and as he was recrossing the track was struck by one of defendant employer's engines ''running backwards without a light'' and severely injured. After stating the facts the court says: ''We think these facts bring the case within the Collins case.'' The case is decided upon the authority of the Collins case and the conclusion is ''that the service of Szary was rendered in interstate commerce.'' This brings us to a review of Chicago & Eastern Illinois Railroad Co. v. Industrial Commission of Illinois, 284 U. S. 296, decided by the Supreme Court of the United States, January 4, 1932.

''Thomas, an employee of the railroad company, in attempting to oil an electric motor while it was running, was injured by having his hand caught in the gears. The railroad was engaged in both intrastate and interstate commerce. The motor furnished power for hoisting coal into a chute, to be taken therefrom by, and for the use of, locomotive engines principally employed in the movement of interstate freight.''

The court says:

"The contention that Thomas was employed in interstate commerce at the time of the injury, rests upon the decisions of this court in Erie R. R. Co. v. Collins, 253 U. S. 77, and Erie R. R. Co. v. Szary, 253 U. S. 86. In the Collins case the employee, at the time of his injury, was operating a gasoline engine to pump water into a tank for the use of locomotives engaged in both interstate and intrastate commerce. In the Szary case the duty of the employee was to dry sand by the application of heat for the use of locomotives operating in both kinds of commerce; and he was so employed when injured. In each case this court held that the employee was engaged in interstate commerce at the time of the injury, within the terms of the Federal Employers' Act. The only difference between those cases and this one is that here the work of the employee related to coal, while in the Collins case it related to water, and in the Szary case, to sand. Obviously, the difference is not one of substance and if the Collins and Szary cases are followed a reversal of the judgment below would result.

"But in Chicago, B. & Q. R. Co. v. Harrington, 241 U. S. 177, the injured employee was engaged in taking coal from storage tracks to bins or chutes for the use of locomotives used in the movement of both interstate and intrastate traffic; and this court held that the service was not in interstate commerce. After quoting the test for determining whether an employee is engaged in interstate commerce, laid down in Shanks v. Delaware, L. & W. R. Co., 239 U. S. 556, 558, namely, 'was the employee at the time of the injury engaged in interstate transportation or in work so closely related to it as to be practically a part of it,' this court said (p. 180), 'Manifestly, there was no such close or direct relation to interstate transportation in the taking of the coal to the coal chutes. This was nothing more than the putting of the coal supply in a convenient place from which it could be taken as required for use.'

"We are unable to reconcile this decision with the rule deducible from the Collins and Szary cases, and it becomes our duty to determine which is authoritative. From a reading of the opinion in the Collins case, it is apparent that the test of the Shanks case was not followed (see p. 85), the words 'interstate commerce' being inadvertently substituted for the words 'interstate transportation.' The Szary case is subject to the same criticism, since it simply followed the Collins case. Both cases are out of harmony with the general current of the decisions of this court since the Shanks case, Chicago & North Western Ry. Co. v. Bolle, ante, p. 74, and they are now definitely overruled. The Harrington case furnishes the correct rule.''

Considering the provisions of the Federal Employers' Liability Act whereby a common carrier by railroad "while engaging in commerce between any of the several states" is made liable in damages for injury suffered by any person through the negligence of the railroad company "while he is employed by such carrier in such commerce," as construed and interpreted by the Supreme Court of the United States in the cases which we have reviewed, no right of recovery arises thereunder unless the employee was "at the time of the injury engaged in interstate transportation or in work so closely related to it as to be practically a part of it." Citing the Shanks case and Chicago & E. I. R. Co. v. Industrial Comm., supra, it is said in New York, New Haven & Hartford Railroad Co. v. Bezue, 284 U. S. 415, decided January 25, 1932: "The criterion of applicability of the statute is the employee's occupation at the time of his injury in interstate transportation or work so closely related thereto as to · be practically a part of it."

It is held that where an employee is injured while engaged in work upon or directly in connection with an instrumentality which itself is being used in interstate transportation, such as tracks, roadbeds and bridges, or locomotives or cars, embarked upon or immediately about to embark upon the transportation of interstate traffic, the act applies. [Pedersen v. D. L. & W. Railroad Co., 229 U. S. 146; North Carolina Railroad Co. v. Zachary, 232 U. S. 248; Southern Ry. Co. v. Puckett, 244 U. S. 571; Kinzell v. C., M. & St. P. Railroad Co., 250 U. S. 130.] But the cases which we have reviewed, supra, pronounce the test and illustrate it. We are called upon to apply it to the present controversy. The nature of the work being done at the time of the injury is controlling. Respondent argues that Allen was engaged, at the time of the injury, in "maintenance" work, "that is, the cleaning out of the sewer so as to maintain same in proper operative condition" and that the work he was doing "had the effect of facilitating or aiding interstate commerce" and therefore a cause of action arises under the Federal Act. · All work done or carried on in the terminal yards, official, clerical, mechanical or the repair of buildings and other facilities used therein, may, in a sense, be said to be necessary to, and to facilitate, the operation of the railroad in properly carrying on both its interstate and intrastate transportation business and the business could not be conducted without employees who perform all manner of tasks "not directly or intimately concerned with interstate transportation as such, or with facilities actually used therein." New York, New Haven and Hartford Railroad Co. v. Bezue, supra. Allen was not engaged in repairing or putting in usable condition any instrumentality or facility then in use or immediately about to be used in inter-

state transportation. He was enlarging the hole in the top of the sewer main to expedite the cleaning out of the sewer. The relation, if any, of the sewer to interstate transportation was extremely remote for certainly the sewer cannot be classified as an instrumentality actually used in interstate transportation or as having any direct connection therewith. Water and steam was discharged from the boilers, located in the power house, through a pipe into the manhole and thence found its way into the sewer. These boilers were used in generating steam which was conveyed by a system of pipes to the various buildings for heating and to the tracks within the terminal yards where it was used to heat coaches which were to be sent out in both interstate and intrastate trains, while such coaches were stored in the yards, and also to create a draft in starting fires in locomotives, some of which were to be used for interstate trains. This steam was not used to propel the locomotives or any of the machinery used in the terminal.

In the Bolle case, supra, Bolle was in charge of and operating the agency by which steam was generated for the purpose of heating the railroad buildings, and interstate passenger coaches while standing in the yards and "sometimes" this steam was used "to prevent freezing of a turntable" used by interstate locomotives, but the Supreme Court of the United States said: "It is plain that his work was not in interstate transportation and was not so closely related to such transportation as to be practically a part of it." If Bolle was not engaged in interstate transportation or the work he was doing was not so closely related thereto as to be considered practically a part thereof, by no refinement of reasoning can Allen be said to have been so engaged. The work Allen was doing was still further removed and much more remote from interstate transportation.

A review of the facts of the instant case, in the light of the decisions we have cited and referred to and by which we are bound, demonstrates, we think, that the work in which Allen was engaged at the time of the injury "was too remote from interstate transportation to be practically a part of it and therefore that he was not employed in interstate commerce within the meaning of the Employers' Liability Act." Shanks v. Delaware, L. & W. Railroad Co., supra.

The judgment must be reversed. It is so ordered. *Hyde* and *Sturgis, CC.,* concur.

PER CURIAM:—The foregoing opinion by FERGUSON, C., is adopted as the opinion of the court. All of the judges concur.