LIDA SLEE DREW, Administratrix of the Estate of HUGH SLEE, v. MISSOURI PACIFIC RAILROAD COMPANY, a Corporation, Appellant. —100 S. W. (2d) 516.

Division One, January 5, 1937.

*Thos. J. Cole, Henry C. Chiles* and *W. W. Graves, Jr.,* for appellant.

*C. S. Walden, Raymond E. Martin, Horace Blackwell* and *Warren Sherman* for respondent.

BRADLEY, C.—This action is under the Federal Employers' Liability Act (45 U. S. C. A., sec. 51 et seq.) to recover damages resulting from the death of Hugh Slee, an employee of defendant at the time of the accident. Plaintiff administratrix, the widow, remarried and was appointed administratrix after her remarriage. Deceased was in charge of the pump house of defendant at Lake City, in Jackson County, Missouri, and had been for some time and was struck by the pilot of one of defendant's westbound freight trains, a short distance west of the pump house, on November 7, 1930, about eleven A. M., and, from the injuries received, died thereafter on November 15th. Deceased left surviving, so far as concerns this cause, the widow, plaintiff administratrix, and Stella, at the time, age twelve, Mary, age sixteen, and Roy Slee, age eighteen. The cause was tried to a jury. Verdict went for plaintiff in the sum of $9648. Motion for new trial was overruled and defendant appealed.

It is alleged that deceased, at the time he was injured, was engaged in the performance of his duties and was repairing and adjusting a water crane, an instrumentality used to supply water to trains, both in intrastate and interstate transportation. The negligence charged and submitted was: That defendant failed to exercise ordinary care to keep its right of way in a reasonably safe condition for the use of its employees, in that defendant negligently suffered and permitted a part of the right of way, which deceased was required to use in the performance of his duties, to become dangerous and unsafe, in that it permitted a piece of bailing wire or wire to become imbedded in the right of way in such a manner that deceased in passing over the right of way and roadbed tripped upon said wire causing him to be thrown in front of the approaching train.

The answer is: (1) A general denial; (2) plea of contributory negligence; (3) assumption of risk; and (4) a specific denial that deceased, at the time of his injury was engaged in interstate trans-

portation or work so closely related thereto as to be practically a part thereof. Plaintiff replied by general denial.

Assignments, several in number, may be grouped as: On the refusal of defendant's peremptory request at the close of the whole case, and on an alleged excessive verdict. The first assignment, as stated by us, involves two questions, viz.: (1) Was deceased, at the time of his injury, engaged in interstate transportation or work so closely related thereto as to be practically a part thereof? and (2) was there substantial evidence tending to show that defendant was negligent in the manner charged and submitted?

The facts are about these: Defendant has two tracks at Lake City, which tracks run east and west. The north track is the main line and the south track is sometimes referred to as the passing track and sometimes as the Independence branch. Beginning on the east, and north of the tracks are the pump house, the watertank and the depot. These are rather close together, but the distance between is not important. South of the tracks and a short distance west of the pump house is the water crane. An exhaust pipe from the pump house passed through the west side thereof and three or four feet beyond, and then turned south and passed underground to the south side of the tracks, where it discharged. The water crane base, of concrete construction, was cubical in form and extended into the ground about five feet. One could enter this base and have room sufficient to perform whatever work was necessary to do therein in the way of repairs.

Defendant's counsel in their brief correctly state further pertinent facts as follows: "Early on the morning of the accident deceased went to the pump house, returning to his home about eight o'clock for his breakfast. He returned to the pump house between eight-thirty and nine o'clock and was accompanied by two of his married daughters, who were then living at his home, and who were going to put out the family washing at the pump house. According to the testimony of these two daughters, the deceased, shortly after he arrived at the pump house, went southwest across the tracks from the pump house to the water crane and removed a metal trapdoor which leads into the concrete base of the crane which (base) encloses the valves and mechanism of the crane; the deceased descended into the pit of the crane. According to the evidence he made several trips back and forth that morning, prior to the accident, between the pump house and the water crane, and the daughters testified that they had gone over to the water crane several times while he was working and had handed him down tools which he had asked for and saw the deceased tightening bolts and doing other work in the pit. They further testified that there was water in the pit, which was about five feet deep (not the water) and large enough to accommodate the base and mechanism of the crane and a person working. The deceased was injured some time between ten-thirty and eleven o'clock and the evi-

dence of these two girls shows that he was engaged in the work in this pit up until about five minutes before the accident occurred. About five minutes before the accident occurred he was seen where the exhaust pipe leading from the gasoline engine in the pump house emptied south of the tracks, which was between fifteen to twenty-five feet east of the water crane. His whereabouts or what he was doing are not accounted for during this five minutes preceding the accident, but the testimony of his two daughters shows that when they heard the train whistle they saw their father coming out of the ditch south of the tracks about the location of the exhaust pipe, and at that time the train was about five hundred feet east of him and in plain view; that he proceeded in a northwesterly direction across the two tracks with some tools in his hand and that when he had reached a point within about four feet of the south rail of the main line track he stopped, looked at the train, waited as if to let it pass, then started to go forward when he caught his foot in a wire causing him to stumble across the main line track, the train striking him on the right shoulder knocking him about fifteen feet to the west side of the pump house; that when he first stumbled the train was about 125 feet east of him." It further appears that the train was running about thirty-five miles per hour.

Was deceased, at the time of injury, engaged in interstate transportation or work so closely related thereto as to be practically a part thereof? For the purpose of the question, it is conceded that at the time of his injury deceased was engaged in repairing the water crane, an instrumentality used to supply water to trains engaged in both inter and intrastate traffic. In the application of the Federal Employers' Liability Act, we, of course, are bound by the decisions of the Supreme Court of the United States. [Stogsdill v. St. Louis-S. F. Ry. Co., 337 Mo. 126, 85 S. W. (2d) 447.] The cases are numerous where this question has been presented and there is diversity of opinion. After Erie Railroad Co. v. Collins (1920), 253 U. S. 77, 40 Sup. Ct. 450, 64 L. Ed. 790, and Erie Railroad Co. v. Szary, 253 U. S. 86, 40 Sup. Ct. 454, 64 L. Ed. 794, and prior to the ruling in Chicago & E. I. Ry. Co. v. Industrial Commission of Illinois (1932), 284 U. S. 296, 52 Sup. Ct. 151, 76 L. Ed. 304, 77 A. L. R. 1367, many kinds of work remote to interstate transportation was held to be so closely related to interstate transportation as to be practically a part of it. (And we might say that after the C. & E. I. Ry. Co. v. Industrial Commission of Ill., there have been decisions, by some of the State courts, which seem to be even beyond the borderland.) In the Collins case, the employee operated a water tank. The tank was used to supply the locomotives of both inter and intrastate trains with water, which was pumped from a nearby well into the tank by a gasoline engine which Collins operated. While engaged in starting the engine the gasoline exploded, and he was seriously burned. A.

defective engine was the cause of the explosion. It was held that Collins, at the time of his injury, was engaged in a work so closely related to interstate commerce "as to be practically a part of it." In the Szary case, the employee's work was drying sand in stoves in a small structure near the tracks and supplying the sand to locomotives operating in both inter and intrastate commerce. He was injured while returning from an ashpit where he had gone to dump ashes from one of the stoves after sanding several locomotives bound to other states. It was held, following the Collins case, that Szary, at the time of his injury, was engaged in a work so closely related to interstate commerce as to be practically a part thereof.

Shanks v. Delaware, Lackawanna & Western Railroad Co., 239 U. S. 556, 36 Sup. Ct. 188, 60 L. Ed. 436, L. R. A. 1916C, 797, was prior to the Collins and Szary cases. In the Shanks case (as appears from 214 N. Y. 413, as well as from 239 U. S. 556) the employee Shanks, at the time of his injury, was working as a mechanic in a shop. His principal work was running a shaping machine, where he shaped parts to be used in the repair of locomotives. His work was generally, but not exclusively, in the repair of locomotives used in interstate commerce. The power was applied to the shaping machine, used by him, from a countershaft and pulley attached by hangers to girders about eighteen feet above the shop floor. The countershaft was to be moved, and to do so, it was necessary to take it down and change the hangers to which it was suspended. The countershaft was taken down and Shanks, while making new holes in one of the girders was injured by a crane being moved without warning. His work "had to do with the supply of power to a machine that might thereafter be used in shaping parts for the repair of locomotives" used in interstate commerce. As to the work Shanks was doing, the Supreme Court said: "What he was doing was altering the location of a fixture in a machine shop. The connection between the fixture and interstate transportation was remote at best, for the only function of the fixture was to communicate power to machinery used in repairing parts of engines some of which were used in such transportation. This, we think, demonstrates that the work in which Shanks was engaged, like that of the coal miner in the Yurkonis case (238 U. S. 439), was too remote from interstate transportation to be practically a part of it, and therefore, that he was not employed in interstate commerce within the meaning of the Employers' Liability Act." The Supreme Court, in the Shanks case, further went on to say: "Having in mind the nature and usual course of the business to which the act relates and the evident purpose of Congress in adopting the act, we think it speaks of interstate commerce, not in a technical legal sense, but in a practical one better suited to the occasion." And then said that "the true test of employment in such commerce in the sense intended is, Was the employee, at the time of his injury,

engaged in interstate transporation, or in work so closely related to it as to be practically a part of it;" and then applying the test to the facts in the case, the court ruled that it was plain "that Shanks was not employed in interstate transportation." The test laid down in the Shanks case was followed in C., B. & Q. Railroad Co. v. Harrington, 241 U. S. 177, 36 Sup. Ct. 517, 60 L. Ed. 941. The Harrington case originated in Kansas City, Missouri. [See Harrington v. C., B. & Q. Railroad Co., 180 S. W. 443.] Harrington, a switchman, was killed while engaged as a member of the switching crew in running cars of coal into bins for storage, which coal would be used in locomotives in both interstate and intrastate commerce. The suit was brought in the Circuit Court of Jackson County, but not under the Federal Employers' Liability Act. The railroad company contended that Harrington, at the time of his injury and death, was engaged in interstate commerce, and that recovery could not be had under the State law. It was held by the Kansas City Court of Appeals that Harrington "was not engaged in interstate commerce at the time of his injury and death," and a judgment for the widow was affirmed. The case went to the Supreme Court of the United States on writ of error and the judgment was affirmed. In speaking of Harrington's duty the court (241 U. S. 177, l. c. 180) said: "That duty was solely in connection with the removal of the coal from the storage tracks to the coal shed, or chutes, and the only ground for invoking the Federal Act is that the coal thus placed was to be used by locomotives in interstate hauls. As we have pointed out, the Federal Act speaks of interstate commerce in a practical sense suited to the occasion and 'the true test of employment in such commerce in the sense intended is, was the employee at the time of the injury engaged in interstate transportation or in work so closely related to it as to be practically a part of it.' [Shanks v. Del., Lack. & West. Railroad, 239 U. S. 556, 558, and cases there cited.] Manifestly, there was no such close or direct relation to interstate transportation in the taking of the coal to the coal chutes. This was nothing more than the putting of the coal supply in a convenient place from which it could be taken as required for use."

In Chicago & N. W. Railroad Co. v. Bolle (1931), 284 U. S. 74, 52 Sup. Ct. 59, 76 L. Ed. 173, the facts, briefly, are that Bolle was injured while firing a stationary engine to generate steam used for heating a depot, baggage room and rooms devoted to general railroad purposes. The steam was also used to heat suburban coaches while standing in the yards, some of which coaches were to be carried in interstate suburban trains. It was held that while so engaged Bolle was not engaged in work so closely related to interstate transportation as to be practically a part thereof. In the Bolle case the court referred to the test laid down in the Shanks case, supra, and said that "the applicable test thus firmly established is not to be shaken

by the one or two decisions of this court where, inadvertently, the word 'commerce' has been employed instead of the word 'transportation.' " The "one or two decisions" where the word "commerce" was inadvertently used for the word "transportation," are the Collins and Szary cases, supra. [See Stogsdill v. St. Louis-S. F. Ry. Co., 337 Mo. 126, 85 S. W. (2d) 447, l. c. 454.] In Chicago & E. I. Railroad Co. v. Industrial Commission of Illinois (1932), 284 U. S. 296, 52 Sup. Ct. 151, 76 L. Ed. 304, 77 A. L. R. 1367, the Collins and Szary cases were "definitely overruled." In Chicago & E. I. Railroad Co. v. Industrial Commission of Illinois, supra, "Thomas, an employee of the railroad company, in attempting to oil an electric motor while it was running, was injured by having his hand caught in the gears. The railroad was engaged in both intrastate and interstate commerce. The motor furnished power for hoisting coal into a chute, to be taken therefrom by, and for the use of, locomotive engines principally employed in the movement of interstate freight." An action was brought before the Illinois Industrial Commission to recover compensation under the Illinois Workmen's Compensation Act. The railroad company contended, and an arbitrator appointed by the commission found, that the work which Thomas was doing when injured was in interstate commerce and that the commission did not have jurisdiction. The commission held contrary to this contention and awarded compensation. The cause finally reached the United States Supreme Court on certiorari where it was ruled that Thomas was "not engaged in interstate transportation, or in work so closely related to it as to be practically a part of it."

In Fears v. Boston & M. Railroad (1933-N. H.), 166 Atl. 283, the Supreme Court of New Hampshire quoted, in part, what the Supreme Court of the United States said of the Collins and Szary cases in Chicago & E. I. Railroad Co. v. Industrial Com. of Ill., supra, and then the New Hampshire court said: "Judged in the light of this decision, it seems more probable that it should be held that the plaintiff was not within the act. His work of breaking down the frozen crust at the top of the hopper was, in the approved language of the Harrington case, 'nothing more than the putting of the coal supply in a convenient place from which it could be taken as required for use.' It is true that the earlier placement would have been sufficient but for the action of the elements. That action had caused the placement to be deficient. Without further labor upon it the coal was not in a condition to be delivered by the opening of the shutter. The plaintiff was not aiding a defective delivery from the chute, but putting the coal in order for some future delivery."

There is a kind of twilight zone (Halley v. Ohio Valley Elec. Ry. (W. Va.) 114 S. E. 572, l. c. 576), where it is difficult to determine whether the work of an employee is or is not so closely related to interstate transportation as to be practically a part of it, but all

the authorities, where the subject is mentioned, agree that each case, when on the borderland, must be determined by its own facts. [Boles v. Hines (Mo. App.), 226 S. W. 272.] In the following cases (in addition to those above mentioned) it was held that the work being done by the employee was not work in interstate transportation or so closely related thereto as to be practically a part of it. [Stogsdill v. St. Louis-S. F. Ry. Co., 337 Mo. 126, 85 S. W. (2d) 447 (oiling machinery used to hoist coal to bins from which coal was supplied to inter and intrastate trains); Boles v. Hines (1920-Mo. App.), 226 S. W. 272 (repairing a depot used in both inter and intrastate commerce); Capps v. Atlantic Coast Line Railroad Co. (1919-N. C.), 101 S. E. 216 (repairing a coal chute by which both inter and intrastate trains were supplied with coal); Phillips v. Chicago & N. Ry. Co. (1929-Minn.), 225 N. W. 106 (readjusting a sandpipe used to convey sand to a tank, the sand to be used when needed on engines to inter and intrastate trains); Gallagher v. New York Central Railroad Co. (N. Y.-1918), 119 N. E. 1044 (repairing coal pockets from which interstate trains took coal. Certiorari to Supreme Court of United States denied, 248 U. S. 559); Kelly v. Penn. Railroad Co. (C. C. A. 3rd-1916), 238 Fed. 95 (repairing coal chute which supplied coal to both inter and intrastate trains); Phillips v. Baltimore & O. Railroad Co. (1926-Pa.), 135 Atl. 102 (remodeling bins used to store spare railroad parts used in inter and intrastate transportation); Boyer v. Penn. Railroad Co. (1932-Md.), 159 Atl. 909 (enlarging existing water tank foundation to allow replacement of water tank engine without interruption of water service); Martin v. Central Railroad Co. (1936-N. J.), 182 Atl. 897 (repairing skylight of terminal train shed); Penn. Railroad Co. v. Manning (C. C. A. 3rd), 62 Fed. (2d) 293 (repairing electric motor furnishing power to crane which loaded and unloaded both inter and intrastate commerce. Certiorari denied—289 U. S. 738, 53 Sup. Ct. 657, 77 L. Ed. 1485); Donaghy v. Oregon-Wash. Railroad & Nav. Co. (1930-Ore.), 288 Pac. 1003 (repairing crane used to maintain tracks); Montgomery v. Terminal Railroad Assn. (1934), 335 Mo. 348, 73 S. W. (2d) 236 (member of bridge crew thrown from motor car he was operating while on way to repair an overhead bridge carrying a public highway over the tracks. Certiorari denied, 293 U. S. 602, 55 Sup. Ct. 118, 79 L. Ed. 694); Allen v. St. Louis-S.F. Ry. Co. (1932), 331 Mo. 461, 53 S. W. (2d) 884 (cleaning out sewer, constructed by railroad, to take care of sewage of terminal buildings, and while so engaged blowoff valves on boilers connected with sewer were opened and employee scalded—the steam from these boilers was used to heat buildings in terminal yard, coaches in inter and intrastate transportation while stored in yard, and to create draft in starting fires in locomotives, both inter and intrastate).]

In the following cases the work being done was held to be so closely related to interstate transportation as to be practically a part thereof:

Pedersen v. Delaware & Lackawanna Railroad Co. (1913), 229 U. S. 146, 33 Sup. Ct. 648, 57 L. Ed. 1125 (carrying from tool car a sack of bolts to be used in repairing railroad bridge); Southern Pac. Co. v. Industrial Com. of California (1920), 251 U. S. 259, 40 Sup. Ct. 130, 64 L. Ed. 258 (wiping insulators supporting a main wire which was the conductor of electricity used to move cars in both inter and intrastate commerce); Southern Ry. Co. v. Puckett (1917), 244 U. S. 571, 34 Sup. Ct. 703, 61 L. Ed. 1321 (clearing track after wreck); Newkirk v. Pryor (1916-Mo. App.), 183 S. W. 682 (repairing pump house which housed the machinery used to pump water into water tank); L. & N. Ry. Co. v. Stewart's Admr. (1925-Ky.), 269 S. W. 555 (painting shaft of elevator used to lift coal to chute from which engines of both inter and intrastate trains were supplied); Halley v. Ohio Valley Elec. Ry. Co. (1922-W. Va.), 114 S. E. 572 (installing a new transformer to take place of old one which regulated current used in operating cars interstate); Freeman v. Frasher (1928-Colo.), 268 Pac. 538 (engineer of steam crane injured while operating crane in removing from right of way a pump which, before removal from pump house, had been used to raise water for locomotives); Clemence v. Hudson & M. Ry. Co. (C. C. A. 2d-1926), 11 Fed. (2d) 913 (cleaning debris in shaft leading from subterranean tube to be used as emergency exit, drainpipes also being constructed in shaft, for carrying water from main track); Sells v. Grand Trunk W. Ry. Co. (1917), 206 Ill. App. 45 (repairing cable used to hoist coal to chute); Texas & P. Ry. Co. v. Williams (1918-Tex.), 200 S. W. 1149 (fireman on interstate train was repairing waterspout at a tank where engine must then take water); Steward v. Industrial Com. of Utah (1932), 15 Pac. (2d) 334 (recharging batteries used exclusively in block signal system); Owens v. St. Louis-S. F. Ry. Co. (1932-Mo. App.), 46 S. W. (2d) 930 (repairing water crane); Sheehan v. Terminal Railroad Assn. (1935 en banc), 336 Mo. 709, 81 S. W. (2d) 305 (oiling station elevator used in carrying both inter and intrastate shipments); Kepner v. Cleveland C., C. & St. L. Ry. Co. (1929-Mo. en banc), 15 S. W. (2d) 825 (adjusting a sandpipe on a turntable "used in conveying all engines into the repair shop.")

Southern Pac. Co. v. Industrial Comm. of California (Sup. Ct. U. S.) supra, is among the cases relied on by plaintiff in the present case. In that case, as appears above, the employee was wiping insulators which supported the wire through which the power passed to move the cars. The work there might well be comparable to work of an engineer upon his engine while actually engaged at the moment in interstate transportation, and about such work there would be no room for argument. And the same might be said of the Holley case (W. Va.), supra, where the employee was installing a new transformer, and also similar is the Steward case (Utah), supra, where the employee was recharging batteries. In the Texas & P. Ry. Co.

v. Williams (Tex.), supra, the employee, fireman on interstate train, was repairing the spout at the watertank where his engine *must* then get water. The Owens case, supra (Mo. App.), supports plaintiff's contention in the present case, but notwithstanding our great respect for the learning of the Court of Appeals we are constrained to disapprove the conclusion reached in that case and it is overruled. There is a marked distinction between track repair work, as was the work in the Pedersen case, supra (upon which the Owens case was based) and water crane repair. The distinction is this: Trains cannot, with reasonable safety, run over a track out of repair, hence repair of the track is essential to transportation. Trains can run over a track where a water crane, out of repair, is located (and did so in the Owens case) hence the service of a particular water crane is not, generally, reasonably essential to transportation. As pointed out, it was not reasonably essential in the Owens case and was not in the present case. The repair being done on the water crane in the present case and in the Owens case was no more closely connected with interstate transportation than the work (oiling motor used to hoist coal to chute) being done in Chicago & E. I. Ry. Co. v. Industrial Com. of Ill. (Sup. Ct. U. S.), supra, and in the Stogsdill case (Mo.), where the work was about the same as in C. & E. I. Ry. Co. v. Industrial Com. of Ill. In the Sheehan case (Mo.), the work being done was on an instrumentality used *in conveying* both inter and intrastate shipments. In the Kepner case, supra (Mo.), the turntable was used to convey *all* engines into the shop and, under the facts, was such an instrumentality as might be comparable to the track itself, and we do not regard that case as controlling here. As stated at the outset, we must follow the construction given the Federal Employers' Liability Act by the Supreme Court of the United States, and if we do this, we must hold in the present case, that deceased, at the time of his injury, was not engaged in work so closely related to interstate transportation as to be practically a part of it. Having reached this conclusion it is not necessary to rule other assignments.

The judgment should be reversed and it is so ordered. *Ferguson* and *Hyde, CC.*, concur.

PER CURIAM:—The foregoing opinion by BRADLEY, C., is adopted as the opinion of the court. All the judges concur.