D. E. HARRIS. v. MISSOURI PACIFIC RAILROAD COMPANY, a Corporation, Appellant.—114 S. W. (2d) 988.

Division One, April 9, 1938.

*T. J. Cole, F. M. McDavid* and *F. W. Barrett,* for appellant.

*C. E. Reed, W. B. Myres, F. P. Sizer, H. G. Waltner, Jr.,* and *Franklin E. Reagan,* for respondent.

BRADLEY, C.—This cause, for personal injury, was brought under the Federal Employers' Liability Act. [45 U. S. C. A., Secs. 51-59.] The jury returned a verdict in favor of plaintiff for $40,-000. On hearing of motion for new trial, a *remittitur* of $25,000

was made, judgment for $15,000 entered, motion overruled and defendant appealed.

The cause was filed in Stone County, but the venue was changed to Christian County. We first dispose of a motion to dismiss the appeal. There are several grounds alleged in the motion, but, in effect, they all go to the contention that the bill of exceptions was not filed. The record proper, among other things, shows the trial, the filing and overruling of motion for a new trial, the judgment, appeal, and then recites that thereafter and within the time granted, the bill of exceptions "was duly allowed, signed and sealed and ordered filed in said circuit court of Christian County, Missouri, and the same was duly filed in said court and order made and entered of record showing the filing thereof."

The abstract of the bill of exceptions recites that "now on this 7 day of September, 1936, comes the defendant, by its counsel, and asks that this, its bill of exceptions, be signed, sealed and made a part of the record of said cause. Which is accordingly done on this 7 day of September, 1936. Robert L. Gideon, Trial Judge."

The cause was set for hearing in this court on September 21, 1937. The motion to dismiss the appeal was served on defendant September 15, 1937. An additional abstract, in support of the motion, was served on defendant September 16, 1937, and filed here September 20, 1937, which additional abstract states that "since the printing of respondent's brief another bill of exceptions was found by the clerk a few days ago in his office, which shows the following endorsement on page 260, the last sheet thereof:

"Bill of Exceptions

"Now on this the 30th day of Oct., 1936, comes the defendant by its counsel, and asks that this, its bill of exceptions be signed, sealed and made a part of the record of said cause.

"Which is accordingly done this the 30th day of Oct., 1936.

"Robert L. Gideon,

"Trial Judge.""

The additional abstract states that "stamped on the back of sheet 260 (of the bill of exceptions) are two indistinct filing stamps by the clerk as follows: Filed Oct. 30, 1936. Elmer Aven, Circuit Clerk." Then the additional abstract says: "Endorsed on the back of sheet 259 is a like stamp filing. On the back of sheet 258 is another like filing date, indistinct, but evidently intended for October 30th, 1936."

The additional abstract further shows that September 7, 1936, was the first day of the September Term of the court; that October 30th was the last day of the term; and that there was no *record* entry while court was in session, recess or vacation, showing the filing of the bill of exceptions.

Our Rule 11, among other things, provides: "If the respondent desires to make objections . . . that the bill of exceptions was duly signed or filed, or that the appeal was duly taken, such objections and the reasons therefor shall be served in writing on the appellant or his counsel, fifteen days before the day on which the cause is docketed for hearing, or within fifteen days after the abstract is served. Any such objections not so specified shall be deemed waived and will not be considered by the court." As above stated, the cause was set for hearing in this court, September 21, 1937, and it appears that copy of abstract was served on respondent July 30, 1937, and abstract filed here July 31st.

One of respondent's counsel filed an affidavit here stating that "on or about September 15, 1937, respondent's counsel for the first time learned" about the situation relative to the filing of the bill of exceptions. Appellant calls our attention to Rule 11, quoted in part, supra, and to State ex rel. Chester, P. & Ste. G. Ry. Co. v. Turner, et al., 270 Mo. 49, 191 S. W. 987. What we may call the Turner case grew out of the facts disclosed in Callier v. Chester, P. & Ste. G. Ry. Co., 158 Mo. App. 249, 138 S. W. 660. Callier obtained a judgment against the railroad company, and the railroad company appealed, and sent by express its bill of exceptions to the clerk (Turner) to be filed. He received the bill, put it in the vault, but did not unwrap it, or mark or stamp it filed, and made no record entry as to filing. The St. Louis Court of Appeals (158 Mo. App. 249) held that the bill of exceptions *was not filed*, and Callier's judgment was affirmed on the record proper. In a suit by the railroad company on Turner's bond the Springfield Court of Appeals held that the bill of exceptions *was filed* (177 Mo. App. 454, 163 S. W. 951), but certified the cause to the Supreme Court, because in conflict with the holding by the St. Louis Court of Appeals. This court (en banc), 270 Mo. 49, 191 S. W. 987, held that the bill of exceptions was filed. But there is a distinction between the Turner case and the present case. In the Turner case, it was conceded that if the bill of exceptions was filed at all, it was filed in vacation, while in the present case, if the bill was filed on any certain day, it was filed September 7th, or October 30th. And as appears above from the additional abstract, these days were court in session days, and respondent urges that such being the case, the filing of the bill could only have been accomplished on either of these days by an order of *record* made by the *court*. On the other hand appellant says that there is nothing to show that the clerk did not receive the bill and stamp it filed either on September 7th or October 30th, before court convened or after it adjourned on these days.

Whatever the ruling should be on the merits of the motion, we

express no opinion. There is no claim of fraud or sharp practice which prevented plaintiff from discovering the situation sooner. In the circumstances, that plaintiff did not discover the situation in time to comply with Rule 11, cannot alter the rule. Clearly, under the rule, plaintiff waived the right to complain on the filing of the bill of exceptions, and the motion to dismiss the appeal is overruled.

After some preliminary allegations, plaintiff alleged that one of defendant's railroad lines runs from Little Rock, Arkansas, through Van Buren, Arkansas, Fort Gibson and Claremore, Oklahoma, and on into Coffeyville, Kansas, "which was one of the lines regularly used, assigned and devoted to interstate traffic;" that on and prior to September 2, 1931, plaintiff was in the employ of defendant, and that it was his duty to operate on defendant's railroad a motorcar, attached to a mowing machine, which machine ran on the rails, "and was used in mowing grass and weeds and other vegetation growing along and adjacent" to the track; that the "mowing machine consisted of a small car with a sickle on either side, . . . which sickles were operated by a small motor stationed upon said mowing machine, and that said mowing machine was hauled and drawn along said railroad track" by the motorcar operated by plaintiff. It is alleged that the governors on the motor of the mowing machine had become defective, and that on September 2, 1931, date of plaintiff's injury, defendant sent two mechanics to repair the mowing machine "which, with the motorcar, was then located at Fort Gibson, Oklahoma."

It is further alleged that about seven A. M., day plaintiff was injured, the mechanics took charge of the moving machine and undertook to repair the same, "and after working on said mowing machine for sometime, took the same out, with plaintiff operating the motorcar, and proceeded to mow weeds and grass along the right of way of the defendant's track near Fort Gibson, and in order to further complete the repair and correct the improper operation of said motor, temporarily stopped said motorcar on the north gin spur of defendant's track at Fort Gibson, and proceeded to test out and complete the repairs thereon; that the defendant's said motor repairman, Bartlett, was then present, in charge of said mowing machine, and while the motor thereon was running, but while the belt which was used to convey power from said motor to the sickles was not running, ordered and directed this plaintiff to place his foot upon and tighten said belt for the purpose of testing out said motor and causing the same to labor so as to aid and assist in the repair thereof, and to determine the nature and extent of the troubles, and the defects then existing in said motor and the governors thereof, and thereupon assured the plaintiff that he could do so with safety; that said belt was then loose and the pulley wheel

was idling in the same, so that said belt was not moving; that the chain on the idler of said belt had become and was then detached and loose, which permitted said idler to remain free to slip and move about and liable to become entangled or wound in by said belt and which fact rendered it very dangerous to handle or come in contact with said belt and which fact was known to the defendant, its agents, servants and employees, or could have been known by them in the exercise of ordinary care, but was unknown to the plaintiff; that some one of the defendant's employees had immediately prior thereto loosened or slackened one end of said belt, which fact rendered said belt and the handling thereof dangerous, and which fact was unknown to the plaintiff, but was known to the agents, servants and employees of the defendant, or in the exercise of ordinary care could have been known by them.''

Plaintiff further alleged that ''acting under the immediate orders, instructions and directions of the said Bartlett, and relying upon his superior knowledge and skill, plaintiff placed his right foot upon said belt which was then stationary, and when he did so and while carrying out the orders, instructions and directions of defendant, said belt was caused to and did lap and loop and suddenly move so as to catch said idler therein, and thereby plaintiff's foot was caught'' resulting in the injuries complained of.

It is further alleged that plaintiff's ''work as motorcar operator was interstate in character and that he operated said motorcar and mowing machine in the states of Arkansas, Oklahoma and Kansas, and that said mowing machine was used and devoted exclusively to mowing weeds and grass and other vegetation along and adjacent to the track of defendant where its interstate commerce was carried on, and that the work of keeping the grass, weeds and vegetation cut and cleaned from along said railroad tracks, was necessary in the maintenance of said railroad tracks for the prevention of fires in the safe and expeditious handling of interstate freight and merchandise and did expedite and further the interstate work so being carried on by the defendant, and was therefore a necessary part of and incident to and directly connected with the interstate transportation being carried on by the defendant, so that both plaintiff and defendant were at the time of his injuries, as aforesaid, engaged in interstate commerce; and said motorcar had become and was an instrumentality of interstate commerce and had been regularly used and devoted in the interstate work aforesaid, and the repair and maintenance thereof was a necessary work in the proper and efficient maintenance of defendant's track and roadbed for transportation of interstate freight and merchandise.''

Plaintiff alleged five separate grounds of negligence, but went to the jury on the charges that his injuries were directly caused

by the negligence of defendant, in that Bartlett negligently ordered and directed plaintiff to place his foot on said belt and take up the slack, when Bartlett knew or in the exercise of ordinary care could have known that such was dangerous and likely to result in injury to plaintiff, and that some of defendant's employees had negligently removed and detached the chain from the idler, leaving the idler free to move about and liable to be caught and entangled in the belt and injure plaintiff.

Defendant answered by general denial (except admitting that it was a corporation); and by pleading contributory negligence and assumption of risk.

Error is assigned (1) on the refusal of defendant's demurrer to the evidence at the close of the whole case; (2) on instructions given and refused; (3) on an alleged excessive verdict; and (4) on argument of counsel.

The assignment based on the refusal of the demurrer to the evidence raises three questions, viz.: (1) Was plaintiff, at the time of his injury, engaged in interstate transportation or in work so closely related thereto as to be practically a part of it? (2) Did plaintiff assume the risk? and (3) Is there substantial evidence in the record tending to show that defendant was guilty of negligence as submitted?

Measured by the demurrer to the evidence, defendant admits that the mowing machine in question (including the attached motor-car) was used to transport the laborers of the weed gang from one state to another while in the course of their work; and that the machine was used to mow the right of way of an interstate railroad; and that, at the time it became out of repair, it was being used to mow the right of way of an interstate railroad. The question is: Was the repair of the mowing machine, under the facts, a work in interstate transportation or so closely related thereto as to be practically a part of it?

It is conceded that plaintiff was injured while the mowing machine was on the gin spur at Fort Gibson, and while the repair work was going on. "In the application of the Federal Employers' Liability Act, we, of course, are bound by the decisions of the Supreme Court of the United States." [Drew v. Mo. Pac. Railroad Co., 340 Mo. 321, 100 S. W. (2d) 516; Stogsdill v. St. Louis-S. F. Ry. Co., 337 Mo. 126, 85 S. W. (2d) 447.] The Federal Employers' Liability Act (45 U. S. C. A., sec. 51), provides that: "Every common carrier by railroad while engaging in commerce between any of the several States . . . shall be liable in damages to any person suffering injury while he is employed by such carrier in such commerce, or, in case of the death of such employee, to his or her personal representative . . . for such injury or death result-

ing in whole or in part from the negligence of any of the officers, agents, or employees of such carrier. . . . ''

The test as to whether or not an employee, when injured, is under the Federal Act is laid down in Shanks v. Delaware, Lackawanna & Western Railroad Co. (1916), 239 U. S. 556, 36 Sup. Ct. 188, 60 L. Ed. 436, L. R. A. 1916C, 797. Shanks, at the time of his injury, was working as a mechanic. His principal work was running a shaping machine, shaping parts to be used in the repair of locomotives. His work was generally, but not exclusively, in the repair of locomotives used in interstate commerce. The power was applied to the shaping machine, used by him, from a countershaft and pulley attached by hangers to girders about eighteen feet above the shop floor. The countershaft was to be moved, and to do so, it was necessary to take it down and change the hangers to which it was suspended. The countershaft was taken down and Shanks, while making new holes in one of the girders, was injured by a crane being moved without warning.

The Supreme Court of the United States in ruling the Shanks case said: ''It is essential to a right of recovery under the act not only that the carrier be engaged in interstate commerce at the time of the injury, but also that the person suffering the injury be then employed by the carrier in such commerce. . . . The question for decision is, Was Shanks at the time of the injury employed in interstate commerce within the meaning of the Employers' Liability Act? What his employment was on other occasions is immaterial, for . . . the act refers to the service being rendered when the injury was suffered. Having in mind the nature and unusual course of the business to which the act relates and the evident purpose of Congress in adopting the act, we think it speaks of interstate commerce, not in a technical legal sense, but in a practical one better suited to the occasion (see Swift & Co. v. United States, 196 U. S. 375, 398, 25 Sup. Ct. 276, 49 L. Ed. 518, 525), and that *the true test of employment in such commerce in the sense intended is, Was the employee at the time of the injury, engaged in interstate transportation, or in work so closely related to it as to be practically a part of it?* . . . Coming to apply the test to the case in hand, it is plain that Shanks was not employed in interstate transportation, or in repairing or keeping in usable condition a roadbed, bridge, engine, car, or other instrument *then* in use in such transportation. What he was doing was altering the location of a fixture in a machine shop. The connection between the fixture and interstate transportation was remote at best, for the only function of the fixture was to communicate power to machinery used in repairing parts of engines some of which were used in such transportation. This, we think, demonstrates that the work in which

Shanks was engaged . . . was too remote from interstate transportation to be practically a part of it, and therefore that he was not employed in interstate commerce within the meaning of the Employers' Liability Act.'' (Italics ours.)

The test laid down in the Shanks case was reaffirmed in Chicago, B. & Q. Railroad Co. (1916), 241 U. S. 177, 36 Sup. Ct. 517, 60 L. Ed. 941. Later (1920) the Supreme Court, in two cases (Erie Railroad Co. v. Collins, 253 U. S. 77, 40 Sup. Ct. 450, 64 L. Ed. 790, and Erie Railroad Co. v. Szary, 253 U. S. 86, 40 Sup. Ct. 454, 64 L. Ed. 794), did not follow the test laid down in the Shanks case. But, in 1932, in Chicago & E. Ill. Railroad Co. v. Industrial Commission of Illinois, 284 U. S. 296, 52 Sup. Ct. 151, 76 L. Ed. 304, 77 A. L. R. 1367, the Collins and Szary cases were overruled.

From the test rule announced in the Shanks case, and the rule we are required to follow, the term ''interstate commerce'' has no such scope as given in many State and Federal decisions, prior to the overruling of the Collins and Szary cases. As appears above, in the excerpt quoted from the Shanks case, the Supreme Court said that the liability act ''speaks of interstate commerce, not in a technical sense, but in a practical one better suited to the occasion,'' and then laid down the test rule above italicized. ■ As we construe the test rule, the instrumentality being repaired, in order for the repair work to be under the act, must itself be one that is *directly* used in interstate transportation.

In Chicago & Northwestern Railroad Co. v. Bolle, 284 U. S. 74, 52 Sup. Ct. 59, 76 L. Ed. 173, the employee was injured while fixing a stationary engine to generate steam used for a depot, baggage room and rooms devoted to general railroad purposes. It was held that when injured he was not doing work within the Employers' Liability Act. In speaking of the terms ''interstate commerce'' and ''interstate transportation'' the court said that the two ''were not regarded as interchangeable, but as conveying different meanings. Commerce covers the whole field of which transportation is only a part; and the word of narrower signification was chosen understandingly and deliberately as the appropriate term. The business of a railroad is not to carry on commerce generally. It is engaged in the transportation of persons and things in commerce; and hence the test of whether an employee at the time of his injury is engaged in interstate commerce, within the meaning of the act, naturally must be whether he was engaged in interstate transportation, or in work so closely related to such transportation as to be practically a part of it.''

In Southern Pac. Co. v. Industrial Commission of Utah, 264 Pac. 965, Joseph Surrage, while in the employ of the railroad company, was cutting weeds on the interstate right of way. The weeds be-

ing cut included "noxious weeds, to-wit, burdock, cockel bur, wild morning glory and bull thistle, which weeds had theretofore, pursuant to the provisions of Chapter 66 of the Sessions Laws of Utah for 1925, been declared by regulations made by the State Board of Agriculture to be noxious weeds." Surrage used his own team and mowing machine, and while cutting the weeds, the sickle bar of the mowing machine struck something, and the plate in the heel of the sickle bar was bent and a rivet pulled out. In this situation the mowing machine would not function and Surrage could not move it from the right of way until it was repaired. He attempted to repair it, and while hammering on the injured part of the machine, a piece of steel from the hammer or the machine struck him in the eye. He sought compensation under the Utah Compensation Law. The railroad company, the employer, contended that Surrage, at the time of his injury, was engaged in work so closely related to interstate transportation as to be practically a part of it, and that, for such reason, the Compensation Commission had no jurisdiction. The commission denied this contention and awarded compensation, and on appeal, the Supreme Court of Utah affirmed the award of the commission, basing the ruling on the Shanks case, supra, and others.

In Myers v. Chicago, B. & Q. Ry. Co., 296 Mo. 239, 246 S. W. 257, l. c. 264, the court said: "In this case, if plaintiff had been injured while setting fire to the grass on the right of way to prevent fires from consuming the bridges or trestles or fences or telegraph posts of the railroad, it might be well said that he was engaged in interstate commerce, the same as if he had been engaged in repairing the track," but in the present case plaintiff was not injured while *operating* the mowing machine, mowing on the right of way, but while the machine was being repaired.

In Pennsylvania Railroad Co. v. Manning (C. C. A. 3rd), 62 Fed. (2d) 293, the employee was an electrician. At the time of injury he "was inspecting an electrical motor that furnished the power to a crane which loaded and unloaded cars used in both interstate and intrastate commerce. Was he engaged in interstate transportation or in work so closely related to it as to be practically part of it?" It was held that he was not so engaged, and certiorari was denied. [289 U. S. 738, 53 Sup. Ct. 657, 77 L. Ed. 1485.] The court cited (among others), in support of the ruling, the Bolle and Shanks cases, supra, and Chicago & Eastern Illinois Railroad Co. v. Industrial Commission, 284 U. S. 296, 52 Sup. Ct. 151, 76 L. Ed. 304, where it appears that the employee, when injured, was attempting to oil an electric motor, used to furnish power for hoisting coal into a chute "to be taken therefrom by, and for the use of locomotive engines principally employed in the movement of interstate freight."

In the Drew case, supra, 340 Mo. 321, 100 S. W. (2d) 516, we held that the work of repairing a water crane, used to supply water to both intrastate and interstate trains, was not so closely related to interstate transportation as to be practically a part of it.

In Milburn v. Milwaukee, St. Paul & Pac. Railroad Co., 331 Mo. 1171, 56 S. W. (2d) 80, and in the Drew and Stogsdill cases, supra, a number of cases are reviewed, and it is not necessary to further review here. In order to hold that the work of repairing the mowing machine was within the Federal Act, we would have to hold that the mowing machine itself was an instrumentality directly used, when in operation, in interstate transportation. The only interstate transportation directly connected with the mowing machine in the present case was that it was used to transport from state to state the employees who operated it. A railroad "is engaged in the transportation of persons and things in commerce" (Chicago & Northwestern Railroad Co. v. Bolle, supra) and we are constrained to rule under the controlling authorities, as we read them, that the fact that the mowing machine was used to transport from place to place the operating crew, did not make it an instrumentality directly used in interstate transportation. And assuming, but not deciding, that the work of mowing with the machine weeds and grass on the interstate right of way, was work so closely related to interstate transportation as to be practically a part of it, yet we are constrained to rule that the work of *repairing* the machine was not work so closely related to interstate transportation as to be practically a part of it.

The judgment should be reversed, and it is so ordered. *Ferguson* and *Hyde, CC.*, concur.

PER CURIAM:—The foregoing opinion by BRADLEY, C., is adopted as the opinion of the court. All the judges concur, except *Hays, J.*, absent.